John V. SCHAFER, Jr., and wife; Mary Schafer; Thomas Nale, III, and wife; Anna M. Nale; Gene Mentzer, and wife; Ruth Mentzer, Plaintiffs–Appellees,

v.

BARRIER ISLAND STATION, INCORPORATED, Defendant–Appellant.

No. 90–2017.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 5, 1990.

Decided Oct. 22, 1991.

Robert Wilson Freyermuth, Sally Angela Conte, Womble, Carlyle, Sandridge & Rice, Raleigh, N.C., argued (G. Eugene Boyce, on brief), for defendant-appellant.

Louis Hornthal, Hornthal, Riley, Ellis & Maland, Elizabeth City, N.C., argued (John D. Leidy, on brief), for plaintiffs-appellees.

Before WIDENER and NIEMEYER, Circuit Judges, and MICHAEL, District Judge for the Western District of Virginia, sitting by designation.

## OPINION

NIEMEYER, Circuit Judge:

Having purchased three condominiums on the Outer Banks of North Carolina, the plaintiffs demanded that Barrier Island Station, Inc. repurchase the condominiums pursuant to a repurchase agreement that had allegedly been agreed to. Barrier Island refused, contending that a repurchase agreement was never consummated, and this litigation resulted. At trial, the plaintiffs' proof of the agreement consisted of two different versions of the repurchase agreement, one signed by plaintiffs and the other by Barrier Island, and a letter from Barrier Island's attorney which reported that Barrier Island had agreed to the version signed by plaintiffs. The jury found that a written contract existed and entered judgment against Barrier Island in an approximate amount of $825,000, and Barrier Island appealed. Because we conclude that no contract for the repurchase of the condominiums was ever signed by Barrier Island or its authorized representative and that therefore the statute of frauds was not satisfied, we reverse.

## I

John V. Schafer, Jr., and his wife Mary, Thomas Nale, III, and his wife Ann, and Gene Mentzer and his wife Ruth (Mary, Ann and Ruth are sisters) signed contracts with Barrier Island on July 28, 1984, to purchase three condominiums in a development known as Barrier Island Station in the Village of Duck, North Carolina. In each case, the contracts of sale were subject to the condition: "Repurchase agreement to be executed prior to closing, terms and conditions must be acceptable to buyer." At the same time that the plaintiffs signed the contracts of sale, they signed the repurchase agreements which provided that in specified circumstances Barrier Island would buy back the condominiums. Barrier Island executed the contracts of sale but held the repurchase contracts.

Barrier Island Station is a development of four buildings, consisting of "whole ownership" and time-sharing units. Whole ownership units are those which are not subject to time-sharing arrangements. The first two buildings were developed by Barrier Island for whole ownership units. Later, however, for economic reasons, Barrier Island decided to convert those buildings to include time-sharing units and likewise to market buildings three and four as time-sharing units. Any conversion in buildings one and two, however, required the majority consent of the owners.

For these reasons, Barrier Island added language to the repurchase contracts before signing them that made the repurchase obligation of Barrier Island contingent on the successful conversion of buildings one and two to time-sharing units. The added language, which proved offensive to the plaintiffs, read: "Majority vote of all owners in building one and two must be obtained in favor of co-ownership and/or interval ownership prior to repurchase." This added language was unacceptable to plaintiffs and became the basis of the difference between the parties.

Over the next months, several exchanges between the parties took place relating to their positions on the added language. Plaintiffs' attorney, Starkey Sharp, sent a letter dated August 23, 1984, to Barrier Island's attorney, Crouse Gray, stating:

I can understand the desire that your client might have to avoid entering a repurchase agreement if the project did not develop so that time-sharing sales could be accomplished. However, this is not my clients' understanding and they did not intend to limit the repurchase agreement in such a fashion.

J.A. 407. When Barrier Island saw this letter, it advised its attorney Gray that the condition must be included or "we have *no deal*!," *id.*, and Gray passed this communication on to Sharp. Putting the impasse on

hold, Sharp replied in a letter to Gray dated September 10, 1984:

> I spoke with my clients concerning the position that you expressed. They have advised me that in communication with the sales personnel at Barrier Island Station they have been advised of a proposed meeting early this month. They will wait until that meeting occurs before we determine whether or not there is a matter of controversy between us.

J.A. 408. Barrier Island principals testified that they heard nothing further of the matter and that they never agreed orally or otherwise to deleting the language offensive to plaintiffs. In response to the letter, however, Barrier Island's attorney Gray responded by letter dated September 13, 1984, in which he advised Sharp:

> I have been advised that the principals of Barrier Island Station, Inc. have already talked with the sales agent who called your clients to advise that Barrier Island Station, Inc. would agree to abide by the original repurchase agreements as they were drafted prior to the handwritten addenda.

J.A. 409.

No further correspondence took place with respect to the repurchase contracts before closing, and no repurchase contracts were signed in a form agreeable to both parties. At the closing on November 30, 1984, over two months after the last correspondence relating to the repurchase contracts, the sales for the purchase of the three condominiums closed. No repurchase agreements were presented, demanded or executed. Some time after closing, however, the parties exchanged further drafts purportedly to obtain "clean copies" of a repurchase agreement. But, despite a protracted dialogue, they never reached agreement.

On March 21, 1988, over three years after the closing, plaintiffs demanded that Barrier Island repurchase the three condominiums in accordance with the form of repurchase agreement originally signed by them on July 28, 1984, as affirmed by the letter of attorney Gray dated September 13, 1984. Barrier Island refused, taking the position that an agreement had never been reached.

From the judgment entered pursuant to a jury verdict in favor of the plaintiffs, Barrier Island has appealed.

## II

■ Under North Carolina law, which applies in this diversity case, the statute of frauds requires that a contract for the purchase of land be in writing, signed by the person to be charged. The statute provides:

> All contracts to sell or convey any lands ... shall be void unless said contract, or some memorandum or note thereof, be put in writing and signed by the party to be charged therewith, or by some other person by him thereto lawfully authorized.

N.C.Gen.Stat. § 22–2. Because plaintiffs here seek to enforce a contract for the repurchase of their condominiums, the contract must be in a writing signed by Barrier Island or by an agent authorized by Barrier Island to sign it.

The initial form of the repurchase contract which was signed only by plaintiffs did not contain the condition offensive to them, that any repurchase was conditioned on approval of a majority of condominium owners to convert the building from whole ownership units to time-sharing units. Without that language the form of contract was unacceptable to Barrier Island. When Barrier Island inserted the condition that it wanted and returned the contract signed by it to plaintiffs to have them initial the change, the plaintiffs refused because the change was unacceptable to them. The parties agree that no single form of contract representing agreement among them was signed by all parties. For purposes of satisfying the statute of frauds, plaintiffs rely on the letter dated September 13, 1984, (Exhibit F at trial) which was sent by Barrier Island's attorney to their attorney. They argue that the letter performed two functions: (1) it restated an agreement between the parties to delete the disputed language, and (2) it served as the writing signed by Barrier Island because the attor-

ney had authority to send the letter. The letter reads in full:

Dear Starkey [Sharp]:

I am in receipt of your letter dated September 10, 1984. I have been advised that the principals of Barrier Island Station, Inc. have already talked with the sales agent who called your clients to advise that Barrier Island Station, Inc. would agree to abide by the original repurchase agreements as they were drafted prior to the handwritten addenda.

Enclosed please to find copies of the proposed deeds for the three transactions. With best wishes, I am

Cordially yours,

E. Crouse Gray, Jr.

J.A. 409.

Barrier Island contends that the letter never should have been admitted into evidence over its objection and that the letter cannot in any event satisfy the statute of frauds. It argues that the letter constitutes triple hearsay; that it was unauthorized by Barrier Island, and Barrier Island did not even have knowledge of it; and that its attorney Gray had no implied or apparent authority to bind Barrier Island to any version of the repurchase agreement.

The parties devote much attention in their briefs and arguments to the question of whether the letter was hearsay or falls within a hearsay exception. That it states hearsay is revealed by even a cursory review. The letter reports the substance of a conversation between unnamed principals of Barrier Island and its sales agent, which was in turn reported by the agent to plaintiffs. From whom and how attorney Gray learned of the conversation is not stated. It could be little more than a casual report of rumor. Even if the letter was properly admitted under some exception to the hearsay rule, at best for plaintiffs it provided a second- or third-hand report of conversations attributed to Barrier Island principals. If plaintiffs are to succeed on their contention that the letter satisfied the statute of frauds, they must be able to establish that the letter itself evidences an agreement which was authorized by Barri-

er Island to become the basis of resolving the dispute between the parties.

Plaintiffs argue that the letter need not serve as the complete writing, because the letter "agrees" to the original repurchase agreement. Since the statute of frauds may be satisfied by several writings which relate to each other, they argue that the original repurchase agreement provides the terms of the writing, and the letter provides Barrier Island's signature, which was lacking on the original repurchase agreement. *See Hines v. Tripp*, 263 N.C. 470, 139 S.E.2d 545, 548 (1965). However, plaintiffs' argument is not confirmed by the language of the letter. Reduced to its basic elements, it says, "I have been advised ... that Barrier Island *would agree*" to the original draft. Rather than summarizing or stating any agreement, Gray simply reported hearsay information that he received. Moreover, the information received, through a source not necessarily imputed to his client, appears to report but a *willingness* on Barrier Island's part to agree. Rather than purporting to be the writing which resolved the dispute, the Gray letter reported Gray's receipt from an unattributed source of information that his clients would agree to yield to plaintiffs on the issue. Because of the form of the repurchase agreements that were in circulation, one would expect that if the report in the letter were accurate, the most that plaintiffs could argue is that the parties resolved to sign a separate paper constituting an acceptable form of the repurchase agreement.

If the letter were somehow construed to evidence an agreement, plaintiffs still would need to leap the hurdle of proving that Gray was authorized to resolve the issue for Barrier Island. *See Hines*, 139 S.E.2d at 546. They do not rely on express authority given by Barrier Island to Gray to agree to a resolution of the dispute over the added language. They rely instead on Gray's implied authority as an attorney and his apparent authority arising from the manner in which he was permitted to represent Barrier Island in this transaction and in the past.

■ It is undisputed that Gray was retained by Barrier Island as its attorney in the transactions with plaintiffs. The attorney-client relationship, by custom, however, does not imply that an attorney has authority to act as principal and resolve matters of substance. *Cf. Restatement (Second) of Agency* § 7 comment c (1958) (principal's implied consent to agent's authority to act may be manifested through custom, conduct, or the relation of the parties). Thus, when a client retains an attorney to represent the client in litigation, the implied authority of the attorney is limited to conducting procedures and taking necessary steps to prosecute or defend the client in the litigation. Substantive decisions of whether to bring suit, to dismiss suit, or to settle are not by implication ones that the attorney is authorized to make. See *State v. Mason*, 268 N.C. 423, 150 S.E.2d 753 (1966); *State v. Barley*, 240 N.C. 253, 81 S.E.2d 772 (1954); *Stevens v. Johnson*, 50 N.C.App. 536, 274 S.E.2d 281 (1981). Similarly, when a client retains an attorney to represent the client in a transaction, the attorney has implied authority to negotiate the terms of an agreement or operative papers to their final form. But custom of the relationship does not imply an authority for the attorney to execute the documents on behalf of the client. *See Stevens*, 274 S.E.2d at 283; *see also Morr v. Crouch*, 19 Ohio St.2d 24, 48 O.O.2d 43, 249 N.E.2d 780 (1969); *Torrao v. Cox*, 26 Mass.App.Ct. 247, 525 N.E.2d 1349 (1988). This becomes particularly evident when the form of a contract is one which calls for the signature of the principals.

■ The absence of implied authority does not preclude a claim that Gray acted with the apparent authority of Barrier Island. While implied authority arises by custom from establishment of the attorney-client relationship, apparent authority arises from manifestations of the principal to third persons about the authority of the attorney. The Restatement (Second) of Agency well summarizes the distinction:

Apparent authority results from a manifestation by a person that another is his agent, the manifestation being made to a third person and not, as when authority is created, to the agent. It is entirely distinct from authority, either express or implied.... If it exists, the third person has the same rights with reference to the principal as where the agent is authorized.

*Restatement (Second) of Agency* § 8 comment a (1958). To establish apparent authority, the plaintiffs must demonstrate that Barrier Island, by its conduct or statements, clothed Gray with the authority on which plaintiffs relied. *See Lucas v. Li'l General Stores*, 289 N.C. 212, 221 S.E.2d 257, 262 (1976).

In this case the plaintiffs argue that the record shows that Gray was clothed with this authority by Barrier Island and that they therefore were justified in relying on Gray's letter of September 13 as an agreement on the only open issue of the repurchase contract. Because of the emphasis which plaintiffs place on the evidence on which they rely, we quote at length from their summary of the testimony which they claim justifies a finding of apparent authority:

Gray has done virtually all of the legal work of the defendant [Barrier Island] except for time shares. (Tr. 365, 864.) He set up the defendant corporation. (Tr. 363.) He has done the bulk of Shaver and Lancaster's [principals of Barrier Island] legal work since 1980. (Tr. 364.) He has represented defendant in litigation matters and in negotiations with other attorneys. (App. 337.) He is authorized to negotiate and "finalize terms" for defendant. (Tr. 606.) Defendant admits, regarding this case, he was attorney for defendant "insofar as the sale of the property was concerned." (Defendant's Response to Plaintiffs' Request for Admission No. 4.) He regularly represented defendant in real estate transactions. (App. 217–218.) At the time of the transaction, and for some time before, Gray's office was in the building owned by Shaver and Lancaster's affiliated corporation and occupied by them, defendant and their other businesses. (Tr. 362, 364–365.) It was customary practice in Dare County for lawyers to

handle negotiations after one side was represented. (Tr. 217, 373–375.) Gray acknowledged defendant authorized him to act as its spokesman in the negotiations regarding the offensive language. (App. 255.)

Gray also acted as spokesman for the defendant in all post-contract dealings between the parties. Lancaster testified that it was not characteristic of Gray to speak without authority; that he considered him to be careful and cautious; that he carried out his wishes and instructions; that if he had not, he would have gotten rid of him; and that was why Gray was still their lawyer. (App. 330.)

Brief of Appellees at 5–6.

None of these facts, however, points to conduct, statements or other manifestations directed by Barrier Island to plaintiffs that Gray had more authority than was implied from the customary attorney-client relationship. On no prior occasion had he ever signed any contract on behalf of Barrier Island and Barrier Island had never manifested an authorization that he do so. As plaintiffs alleged, he was authorized to negotiate and "finalize terms" for Barrier Island. His practice was to develop a final form of contract for signature by Barrier Island. Similarly, every draft circulated in the transactions with plaintiffs, whether initiated by plaintiffs or by Barrier Island, revealed that Barrier Island would sign through its principals and not through its attorney.

Plaintiffs argued strenuously at oral argument that Barrier Island's responses to requests for admissions, which were read to the jury, presented evidence of apparent authority from which the jury could have concluded that any agreement by Gray was binding on Barrier Island. The pertinent admission to which they point is the response made by Barrier Island to request no. 4:

> It is admitted that E. Crouse Gray, Jr. acted as attorney for the defendant insofar as the sale of the property was concerned.

J.A. 241. This admission on its face, however, confesses to no more than the fact that Gray served *as attorney* in this transaction. It does not infer that as attorney, he had any more authority than any other attorney has when representing a client in a sale transaction.

In summary, the letter Gray wrote on September 13, 1984, which forms the justification for the judgment entered in this case, is not a writing that consummates the repurchase agreement. At best it reports second hand a conversation between Barrier Island's principals and its sales agent that Barrier Island *"would"* agree to plaintiffs' position. Moreover, even if the letter were properly to be construed otherwise, there is no evidence that Gray had implied or apparent authority to sign any binding instrument on behalf of Barrier Island to consummate a repurchase agreement. If he were simply communicating a conversation which he had heard which expressed a willingness to agree, then he no doubt had authority to send the letter. But Barrier Island vigorously denied that it ever authorized Gray to consummate any agreement or that it ever agreed in substance to eliminate the offending language. We find nothing in the record which indicates that the principals of Barrier Island manifested a different intent.

For the reasons stated, therefore, we reverse the judgment of the district court.

REVERSED.

WIDENER, Circuit Judge, dissenting:

I respectfully dissent.

The majority reverses a jury's determination that Barrier Island Station, through its attorney, agreed to enter into a repurchase agreement without an additional handwritten modification it had earlier requested. I believe, however, that there was ample evidence to support that determination.

The evidence adduced at trial, and acknowledged in the majority opinion, established the following. John Schafer and the other buyers executed and returned the contracts of sale and repurchase agreements provided to them by Barrier Island Station. The contracts contained a provi-

sion which conditioned closing on the execution of repurchase agreements that were acceptable to buyer. Barrier Island executed the contracts in turn, but added a handwritten modification to the repurchase agreement that limited its repurchase obligation to successful conversion of the units to timeshare: a condition that would require majority approval of the condominium owners. The buyers, understandably, found this term unacceptable, and it resulted in an impasse to closing.

Seeking to close the purchase, Barrier Island's attorney, Crouse Gray, sent a letter to the buyers to the effect that Barrier Island would agree to the repurchase agreement without its handwritten modification. The impasse now removed, the parties closed two months later, without altering this understanding. Then, the parties attempted to obtain a clean copy of the repurchase agreement, to no avail. Some three years later, the buyers sought to have Barrier Island repurchase the units in accordance with their agreement and Barrier Island refused.

There was other evidence as well. For example, Gray testified, with regard to his authority to bind Barrier Island to the repurchase agreement as originally drafted, that: "I cannot imagine having written such a letter without having talked with John Lancaster or Paul Shaver. If not both of them, prior to drafting the letter." Lancaster and Shaver were the principals of Barrier Island. Their authority to bind the corporation is undisputed. In fact, John Schafer testified that Barrier Island's sales agent Jess Erwin confirmed that Barrier Island had agreed to delete the modification. Furthermore, several repurchase agreement drafts without the handwritten modification, that were signed by the principals of Barrier Island after the date of Gray's letter, were before the jury.

A reasonable inference to be drawn from this evidence, is that Barrier Island was more interested in the sale of the units, than in its lateadded handwritten timeshare condition, and would therefore agree to be bound by a repurchase agreement without it. In any event, I suggest that the majority errs when it holds by necessary implication that such an inference was an impermissible one for the jury to have made.

Apart from what I believe to be the majority's erroneous factual inferences, I believe that reversing this jury's verdict is not well advised for another reason. In so doing, the majority has permitted Barrier Island to conduct its affairs through its attorney, and then avoid the consequences of that conduct when not to its advantage. I suggest that there would be no issue of Gray's authority if he were simply Barrier Island's agent, an incongruous result to say the least. The majority permits Barrier Island to blow hot and cold at the same time.

I would affirm.