**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 25-1971**

───────────

DONTE JACKSON,

        Plaintiff – Appellee,

v.

PROTAS, SPIVOK & COLLINS LLC,

        Defendant – Appellant,

and

VELOCITY INVESTMENTS, LLC,

        Defendant.

───────────

Appeal from the United States District Court for the District of Maryland at Greenbelt. Lydia Kay Griggsby, District Judge. (8:25−cv−00087−LKG)

───────────

Argued: March 17, 2026                         Decided: May 18, 2026

───────────

Before WILKINSON, HARRIS, and BENJAMIN, Circuit Judges.

───────────

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Harris and Judge Benjamin joined.

───────────

**ARGUED:**  Justin Michael Flint, ECCLESTON & WOLF, PC, Washington, D.C., for Appellant.  Emanwel Josef Turnbull, THE HOLLAND LAW FIRM, P.C., Annapolis, Maryland, for Appellee.  **ON BRIEF:**  Channing L. Shor, ECCLESTON & WOLF, PC, Washington, D.C., for Appellant.  Peter A. Holland, THE HOLLAND LAW FIRM, P.C., Annapolis, Maryland, for Appellee.

2

WILKINSON, Circuit Judge:

In this case, a law firm seeks the protection of its client's arbitration agreement. But the law firm is not a party to the agreement, and the fact that its client is a party does not transform it into one. Because the firm is not a party to the agreement, it cannot enforce it. We thus affirm the district court's decision denying the law firm's motion to compel.

I.

This lawsuit arises from a $30,000 loan. WebBank initially extended the loan to Donte Jackson. Then it sold the loan on the secondary market, where Velocity Investments, LLC bought it. Velocity became Jackson's creditor.

When Jackson failed to pay his debt, Velocity sued him in Maryland state court to collect it. Velocity was represented in the state court action by Protas, Spivok & Collins LLC (PSC), a debt collection law firm. Shortly before trial, Velocity dismissed its own suit with prejudice.

Then Jackson initiated this lawsuit against both Velocity and PSC, which he styled as a class action challenging the legality of their "practice of suing on time-barred debt." J.A. 7. In response, Velocity and PSC asked the district court to send the case to arbitration. They pointed to the following provisions of Jackson's original promissory note with WebBank:

> [(18)(a)](ii) "You" and "your" mean WebBank, any person servicing this Note for WebBank, any subsequent holders of this Note or any interest in this Note, any person servicing this Note for such subsequent holder of this note, and each of their respective parents, subsidiaries, affiliates, predecessors, successors, and assigns . . . .

> [(18)(a)](iii) "Claim" means any dispute, claim, or controversy . . . arising

3

> from or relating to this Note . . . .
>
> [(18)](b) Any Claim shall be resolved, upon the election of either you or me, by binding arbitration . . . .

J.A. 64. Velocity argued it had a right to enforce the arbitration agreement because it was a "subsequent holder[]" of the note, which brought it within the definition of "you." PSC argued it had the same right because it was "servicing" the note.

The district court rejected both arguments. As to Velocity, the court agreed that it was a party to the arbitration agreement but held that it had waived its right to arbitrate by filing suit against Jackson in state court. As to PSC, the court held that it was not a party to the agreement at all.

Only PSC appealed.

## II.

Before us now is PSC's appeal of the district court's refusal to compel arbitration of the claims against it. Although this is an interlocutory appeal, the Federal Arbitration Act (FAA) provides us with jurisdiction to consider it. 9 U.S.C. § 16(a)(1)(A). We review the district court's decision de novo. *Meadows v. Cebridge Acquisition, LLC*, 132 F.4th 716, 726 (4th Cir. 2025).

## A.

The FAA embodies "a liberal federal policy favoring arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24 (1983). This policy reflects Congress's desire to "encourage the expeditious resolution of disputes." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 478 (1989). When there is a

valid arbitration agreement between two parties that purports to cover their dispute, the FAA leaves courts "no choice but to grant a motion to compel." *Meadows*, 132 F.4th at 726 (quoting *Adkins v. Lab. Ready, Inc.*, 303 F.3d 496, 500 (4th Cir. 2002)).

Arbitration is "a matter of consent," however, "not coercion." *Volt*, 489 U.S. at 479. When there is no arbitration agreement between two parties, one of them cannot force the other to arbitrate. The FAA's favorable view of arbitration does not "override[] the principle that a court may submit to arbitration 'only those disputes . . . that the parties have agreed to submit.'" *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 302 (2010) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)).

Whether there is an arbitration agreement between the parties is a question of contract formation governed by state law. *First Options*, 514 U.S. at 944. The parties in this case agree that the relevant state law is Maryland's, *see Schulman v. Axis Surplus Ins. Co.*, 90 F.4th 236, 243 (4th Cir. 2024), but they disagree about whether there is an arbitration agreement between them. We turn, therefore, to Maryland contract law to answer the question.

## B.

In Maryland, the first stop when interpreting disputed contract language is its dictionary definition. *Credible Behav. Health, Inc. v. Johnson*, 220 A.3d 303, 311 (Md. 2019). The disputed term in Jackson's promissory note is "servicing." If, but only if, PSC is "servicing this Note" is it a party to the arbitration agreement.

5

1.

PSC points to three dictionary definitions of the word "service" and argues that they all "involve[] payments," just as its legal representation of Velocity involves payments. Opening Br. at 19–20. The relevant definitions of "service" are "to pay interest on (a loan or debt)" from Britannica Dictionary, "to meet interest and sinking fund payments on" from Merriam-Webster Dictionary, and "to pay interest on money that has been borrowed" from the Oxford Learner's Dictionary. *Id.* (citations omitted).

This argument misconstrues the definitions on which it relies. "Dictionaries . . . require careful use," *United States v. Ward*, 972 F.3d 364, 370 n.4 (4th Cir. 2020), and the definitions they offer are by nature intended to be precise. When the definition of a particular word is abstracted into a general idea, it becomes the definition of a different word instead. The fact that the definitions above involve payments does not mean that anything related to payments satisfies them.

In fact, the definitions above involve *making* payments. The word "service" is used in this way when, for example, a company sets aside money in its annual budget for "debt service." This could not possibly be the meaning intended by the phrase "servicing this Note" in Jackson's promissory note. Maryland courts consider words "in context," *Credible Behav. Health*, 220 A.3d at 310 (quoting *Ocean Petroleum, Co. v. Yanek*, 5 A.3d 683, 691 (Md. 2010)), and the context of the phrase "servicing this Note" is the arbitration agreement's definition of "you." The person making payments on the note is, by contrast, "me." The arbitration agreement would mean nothing at all if "you" were the same as "me."

6

2.

Trying another tack, PSC points to a different set of dictionary definitions of "service." Here the relevant definitions are "to provide (someone) with something that is needed or wanted" from Britannica Dictionary, "to perform any of the business functions auxiliary to production or distribution of" from Merriam-Webster Dictionary, and "to provide people with something they need, such as shops, or a transport system" from the Oxford Learner's Dictionary. Opening Br. at 19–20 (citations omitted). According to PSC, these definitions "involve[] . . . providing something necessary," just as its legal representation of Velocity involves providing something necessary. *Id.*

This argument is as implausible as the last, although for a different reason. The object of contract interpretation in Maryland is to discern "what a reasonable person in the position of the parties would have meant," which requires courts to employ a healthy dose of "common sense." *Credible Behav. Health*, 220 A.3d at 311, 313 (citation modified). If the phrase "servicing this Note" in the arbitration agreement referred merely to the provision of something necessary, then it would sweep in entities as far afield as the bank and internet service provider which enable Jackson to withdraw money from his checking account before making payments on the note. We think it fair to say this interpretation belies common sense.

3.

If the only possible definitions of "service" were the ones advanced by PSC, then we would face a problem. But "service" is a word of many meanings. Seventeen meanings, according to Merriam-Webster, including an "Old World tree . . . with bitter fruits."

7

*Service*, Merriam-Webster Online Dictionary. Our task, informed by context and common sense, is to select the most applicable one.

There is one obvious candidate that PSC ignores: "to collect payments and maintain a payment schedule for (a loan)." *Id.* This is a definition commonly attached to the present participle form of the word—"servicing"—and especially when the word is used in association with a debt instrument. *See Servicing*, Oxford English Dictionary ("The action . . . of arranging or collecting the necessary payments in regard to a loan, mortgage, etc."); *Loan Servicing*, Cambridge Dictionary ("[T]he process of collecting and keeping records of payments from a person or organization that has borrowed money."); *Mortgage Servicing*, Black's Law Dictionary (12th ed. 2024) ("The administration of a mortgage loan, including the collection of payments, release of liens, and payment of property insurance and taxes.").

This definition makes perfect sense in context. It limits the scope of the arbitration agreement to a specific kind of entity, rather than opening it up to an unlimited universe of them. This definition is also consonant with the way the term is used in the borrower registration agreement, a contemporaneously executed document that we construe along with the promissory note. *Ford v. Antwerpen Motorcars Ltd.*, 117 A.3d 21, 27 (Md. 2015) ("Where several instruments are made a part of a single transaction they will all be read and construed together . . . ." (quoting *Rocks v. Brosius*, 217 A.2d 531, 545 (Md. 1966))). The borrower registration agreement explains that an entity named Prosper will collect all of Jackson's regular payments and that "all communications regarding [the] loan" should be made to Prosper. J.A. 73. It then proceeds to name Prosper as "the servicer" of the loan,

8

and it contains a nearly identical arbitration provision to the one in the promissory note except it replaces "any person servicing this Note" with "Prosper." J.A. 73, 76.

PSC is not like Prosper, and it does not fit any aspects of the applicable definition of "servicing." It did not maintain a payment schedule for the loan, collect regular payments, keep records of regular payments, send and receive regular communications, or in any other way administer the loan. Instead, it prepared and submitted briefs in a collection lawsuit against the debtor. That is an altogether different function. While PSC in some ultimate sense sought to have the debt satisfied, the means by which it did so differed distinctly from the more mechanical, non-litigative tasks of a loan servicer.

PSC protests that it has a "pay now" button on its website that enables debtors to make regular payments. But its protest does not help its case, because there is simply no evidence that PSC ever tried to collect regular payments from Jackson—via a "pay now" button or otherwise. While PSC performed a service for Velocity that was intended to collect Jackson's debt, it did not service Velocity's loan. As a result, it cannot enforce Velocity's arbitration agreement.

### III.

PSC's effort to secure the benefit of the arbitration agreement is ultimately unsuccessful because the agreement was drafted to protect only creditors and loan servicers, not lawyers. Although lawyers play an important role in the success of debt instruments, it is a distinct one.

Many debt instruments are negotiated, structured, and drafted by lawyers in the first place. When a debtor is in distress, it is often a lawyer that works out a mutually agreeable

9

solution with the creditor. And when a debtor defaults, it is the lawyer that can use formal legal process to pursue what the creditor is owed. The lawyer is both a necessary precondition to debt collection litigation and the actor who handles much of the litigation decisionmaking. *See Schafer v. Barrier Island Station, Inc.*, 946 F.2d 1075, 1079 (4th Cir. 1991) (noting that lawyers generally have implied authority to "tak[e] necessary steps to prosecute or defend the client in the litigation").

Yet as important as a lawyer is, he and the client are not one and the same. Litigation is an effort to vindicate the client's rights, not the lawyer's. For that reason, there are all manner of "substantive decisions" a lawyer is not empowered to make on his own, including the decisions "whether to bring suit, to dismiss suit, or to settle." *Id.* These remain firmly in the province of the client.

The flip side of this arrangement is that some matters remain firmly in the province of the lawyer. The lawyer's obligations as an officer of the court, for example, do not disappear merely because he is simultaneously serving as an agent of the client. *Hickman v. Taylor*, 329 U.S. 495, 510–11 (1947). It is entirely possible for a lawyer to incur liability for his own actions taken in the course of representing another.

This boundary between lawyer and client is the reason why, in the ordinary case, a law firm cannot take advantage of an arbitration agreement that was written to protect its client. It might be a different case if the agreement's language could be construed as extending to the client's agents, or if the law firm had a plausible argument that it deserved the benefits of the agreement even as a non-party. *See, e.g.*, *Schuele v. Case Handyman & Remodeling Servs., LLC*, 989 A.2d 210, 214 n.3 (Md. 2010) (observing that "equitable

10

estoppel allows non-signatories to a contract to enforce a contract's arbitration provision" in some circumstances). But in the absence of broader language, the law firm is a stranger to the agreement. And in the absence of special circumstances, that is enough to resolve this case. Rather than blurring these lines, the attorney-client relationship reinforces them.

We are left with this. The arbitration agreement in this case could have been written in a way that covered PSC, but it plainly was not. If PSC was dissatisfied with the protection the agreement afforded it, it could have declined to represent Velocity. Since it instead accepted the representation, it must also accept the agreement as it is.

For the foregoing reasons, the ruling of the district court is affirmed.

*AFFIRMED*

11