Danny C. CHARFAUROS, John Andrew Atalig and Gina Toves Aldan, Plaintiffs–Appellees,

v.

BOARD OF ELECTIONS, Vicente A. Atalig, George O. Hocog, James M. Mendiola, Miguel M. Sablan, Juan M. San Nicolas, Maria B. Diaz, and Joaquin I. Taitano, Defendants–Appellants.

No. 99–15789.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 14, 2000

Filed May 10, 2001

As Amended on Denial of Rehearing and Rehearing En Banc July 6, 2001.

Nancy J. Gottfried (argued), Office of the Attorney General, Saipan, Commonwealth of the Northern Mariana Islands, for the defendants-appellants.

Robert Goldberg (on brief), Office of the Attorney General, Saipan, Commonwealth of the Northern Mariana Islands, for the defendants-appellants.

Bruce Lee Jorgensen (argued), Palau/Micronesia Law & Mediation Center, Koror, Palau, for the plaintiffs-appellees.

John M. Chambers (on brief), Law Office of John M. Chambers, Saipan, Commonwealth of the Northern Mariana Islands, for the plaintiffs-appellees.

Before: HUG, TROTT, and WARDLAW, Circuit Judges.

WARDLAW, Circuit Judge:

In this appeal from the Supreme Court of the Commonwealth of the Northern Mariana Islands ("CNMI"), Danny C. Charfauros, Gina T. Aldan, and John A. Atalig (collectively, "Appellees") claim that the individual members of the CNMI Board of Elections (collectively, the "Board") violated 42 U.S.C. § 1983 by administering pre-election day voter challenge procedures which precluded a certain class of voters, including Appellees, from voting in a 1995 election on Rota Island. The CNMI Supreme Court reversed the Superior Court's grant of summary judgment in favor of the Board on the ground of qualified immunity. Affirming the judgment of the CNMI Supreme Court, we hold that because the procedures employed by the Board violated Appellees' fundamental right to vote; the right to vote was clearly established at the time of the election; and a reasonable Board would have known that its actions violated Appellees' right to vote, the individual Board members are not entitled to qualified immunity. We also hold that the allegations of the complaint are sufficient to support liability of the Board members in their individual capacities and that the composition of the CNMI Supreme Court's Special Judge panel did not violate the Board's right to due process of law.

## I. Background

On November 4, 1995, an election was held for the District No. 6 Board of Education representative on the tiny island of Rota in the Northern Mariana Islands. Five days before the election, the Board of Elections disqualified four registered Republican voters and prevented them from voting. As it turns out, this disqualification determined the outcome of the election: Aniceto H. Mundo ("Mundo") won the only open seat on the school board by a margin of three votes. Following an election contest by the defeated candidate, Marja Lee Taitano ("Taitano"), however, the disqualified voters were permitted to vote, and the election results were retabulated and reversed: Taitano prevailed over Mundo by one vote. *See Taitano v. Mundo*, Civ. Act. No. 95–1082 (N. Mar. I. Commw. Super. Ct., April 11, 1996). Although it may seem unusual that a school board election in a remote island territory would produce a case before the United States Court of Appeals, it arrived at our doorstep via a now well-publicized route: the failure of those charged with administering the election to treat each registered voter on an equal basis with every other.

Rota islanders, like those who live throughout the Northern Mariana Islands, enjoy the privileges and protection of the United States Constitution under section 501 of the Covenant to Establish a Commonwealth in Political Union With the United States of America, reprinted as amended in 48 U.S.C. § 1681 note. Rota is one of three small islands that make up CNMI. It is approximately ten and a half miles long and three miles wide, with an

area just shy of thirty three square miles. In 1995, the island's population was 3,509.

On October 16, 1995, fifteen working days before the November 4 election, the President of the Democratic Party of Rota, Herman A. Apatang, wrote to the Chairman and the members of the Board of Elections, challenging on behalf of the Democratic Party of Rota the qualifications of approximately twenty registered Republican voters on the ground that they did not have a bona fide residence on Rota.[1] Twice, the letter specifically requested that administrative hearings regarding these challenges be held "prior to election day." Although the Republican Party of Rota also challenged the eligibility of some democratic voters, the CNMI Supreme Court record and, hence, the record before us contain no documentation of those challenges.

In response, the Board changed the rules of the game in midstream by implementing a new procedure for hearing and adjudicating pre-election voter eligibility challenges. In the ensuing election contest, the procedure so devised was described by the CNMI Superior Court as "unprecedented," "unpublished," and "egregious." *See Taitano*, No. 95–1082(R).[2] Pursuant to this new procedure, after receiving the written lists of challenges from the Democratic and Republican representatives, the Board sent letters informing the challenged individuals that their voting eligibility was in question and that an eligibility hearing would be held on October 30, 1995, five days before the November 4 election. The letters were mailed to the addresses listed on the voters' registration applications. Although the record is unclear as to whom the challenges were sent, the record is clear that only the challenges lodged by Apatang on behalf of the Democratic Party were heard on October 30. None of the Republican Party's challenges to the qualifications of Democratic voters were heard at that time. Thus, the Board created two classes of challenged voters—Republican voters, whose eligibility was challenged by the Democratic Party and considered before the election, and Democratic voters, whose eligibility was challenged by the Republican Party and considered after the election.

The Chairman of the Board of Elections, Miguel Sablan, justified this dichotomous treatment on the ground that the Democratic Party's challenges "were pretty specific," providing a specific location outside of Rota where the challenged individual was residing. In fact, the portion of the Democratic Party's challenge letter referred to by Sablan contained three columns. The first column indicated the challenged voter's name, the second set forth the person's voter registration affidavit number, and the third, entitled "Currently Residing," identified one of five locations: Guam, Saipan, Arizona, California, or U.S. No more specific information—such as street addresses or post office boxes—was provided. According to Sablan, the Board needed this information to contact the challenged individuals and to provide them with sufficient time to

---

1. This case involves only three of the voters challenged by the Democratic Party in that letter.

2. The parties agree that the factual findings of the CNMI Superior Court in *Taitano v. Mundo*, No. 95–1082(R) are undisputed. Had they not done so, we nevertheless would be bound by the findings of the *Taitano* court because "[f]indings made in one proceeding in which a party has had a full and fair opportunity to litigate may be used against that party in subsequent litigation." *Masson v. New Yorker Magazine Inc.*, 85 F.3d 1394, 1400 (9th Cir.1996).

defend their voter eligibility. The reason given for the failure to hear the Republican Party's challenges was that similar information was not provided, even upon request, and therefore, the individuals it challenged could not be located early enough for a fair hearing before the election.

During the hearing on voter eligibility, the Board "relied almost exclusively on the 'research' of Herman Apatang in making its determinations concerning voter eligibility ... such 'research' amounted to little more than reliance on who Mr. Apatang knew personally or recalled seeing on Rota in the weeks preceding the November election." *Taitano*, No. 95–1082(R) at 9. Both the CNMI Supreme Court and CNMI Superior Court characterized this research as "insubstantial" and "incorrect." Apatang testified that he "had not seen [Charfauros] on Rota, that he had a small family name and that the family name was 'not in Mr. Apatang's family roots.'" *Id.* at 6. Apatang had neither "seen Mr. Atalig on Rota" nor did he "know when [Mr. Atalig] returned to Rota prior to the election." *Id.* at 7. Apatang "told the Board that Mr. Atalig was employed by Freedom Air and was living on Guam." *Id.* Apatang also testified that although he did "not know Ms. Aldan personally," he knew "what she looks like and through his investigation found out that she is not residing or employed on Rota and is staying with her mother on Guam." *Id.* Finally, Apatang testified that normally "his research included an inquiry whether the contested voter owned a Rota homestead," but that he had not gotten to that stage in his investigation of either Atalig or Aldan. No additional evidence was presented to suggest that Appellees lived outside Rota. To the contrary, Rota Senator Paul Manglona testified at the Board's hearing that Charfauros was living on Rota and managing his father's business on the island. Jim Atalig, John Atalig's brother, testified that John Atalig and Aldan both lived with Atalig's family in Sinapalo, Rota. Yet, despite this conflicting evidence, all three Appellees were deemed ineligible for the November 4 election. All in all, seven Republicans were allowed to vote, seven were completely disqualified, and six were transferred to district of Saipan and therefore not permitted to vote in the Rota school board election.

The excluded voters were listed in an unpublished memorandum written by Juan M. Diaz, the Executive Director of the Board of Elections, on November 2, 1995. No formal procedure was used to advise the voters of their disqualifications, and no revised list of qualified voters was published. Two of the voters were told by Senator Manglona, who had seen the November 2 list, of their disqualification; Charfauros learned of his disqualification when he was denied an absentee ballot; and two others received notice by hand delivered letters advising them their registration had been transferred to Saipan. It is not clear from the record before us how or when Atalig and Aldan received their notices.

The day after the list of excluded voters was issued—the day before the election— counsel for the voters, John Manglona, sent a letter to Diaz, requesting that the Board allow the disqualified voters to vote and suggesting that the ballots be set aside until the eligibility challenges were appealed and resolved. Manglona also suggested that Diaz discuss his proposal with the Board's legal counsel, James Sirok. Although the exact chain of events is not clear from the record, it appears that Diaz spoke with Sirok that night, and decided to hold a meeting with some of the Board members first thing the next morning—election day. According to Board member George Ogo Hocog, "the Board's counsel did not participate in the Board's

review of the voter challenge hearing unless asked for a legal opinion by a member of the Board." *Taitano*, No. 95–1082(R) at 6. It does not appear that such a legal opinion was sought until Diaz decided to set up the breakfast meeting. Thus, the election day breakfast meeting is the first time on this record that legal counsel was consulted about the eligibility challenges.

The meeting was set up the night before the election by Diaz, who called Sablan to inform him that attorney Sirok was concerned with "something about the appeal process." That same night, Sirok attempted to reach the voters' counsel, Manglona, but having been unsuccessful, Sirok left a message stating that the disqualified voters would be permitted to vote in the November 4 election.[3] We do not know whether Manglona received this message. The next morning—the morning of the election—the breakfast meeting, the stated purpose of which was to "listen to [the Board's] legal counsel," was held. Following that meeting, the Board, switching procedures yet again, decided to allow the disqualified voters to vote in the election after all. In accordance with the voters' counsel's suggestions, instructions were issued to allow the disqualified voters to vote if they showed up at the polling places but to keep the votes separate for the time being. No effort was made to contact the disqualified voters on election day to inform them that they could vote. The Board never followed up with phone calls to determine if the disqualified voters actually voted, and in fact, none of them even attempted to vote on November 4.

After the election, all of the excluded voters received a letter from the Board, dated November 7, 1995, stating that although they had been deemed ineligible to vote, they could cast their ballots on November 4. In that letter, the Board promised to preserve their votes until the time within which to appeal the Board's eligibility determination expired. Although the Chairman of the Board claimed that the letter was misdated and had in fact been sent before the election, the undisputed testimony in the record by Executive Director Juan Diaz, was that the letters were correctly dated to reflect the fact that they were sent on November 7, 1995.[4]

When Taitano sued Mundo after the election, seeking a reversal of the election results or, in the alternative, a new election, Charfauros, Atalig, Aldan, and Anabelle Atalig, who is not a party to this lawsuit, were required to testify in open court—over the objection of counsel who requested an in camera hearing[5]—that each would have voted for Taitano. Because the *Taitano* court found that "the evidence the Board relied on to make its determinations on the eligibility of Danny C. Charfauros, John A. Atalig, and Gina Marie T. Aldan inadequate to support the conclusions," it held that the Board's decision to disqualify the voters was not supported by substantial evidence. *Taitano*, No. 95–1082(R) at 9. In the alternative, "[e]ven if the Board had met the 'substan-

---

3. Because the Board did not decide until the following morning to authorize the disqualified voters to vote in the election, query whether Sirok's call to Manglona was authorized by the Board.

4. This argument is a red herring. Because the decision to allow Appellees to vote was not made until November 4, the earliest date

on which the letters could have been mailed was November 4. Assuming the letters were sent on November 4, they would not have been received by the disqualified voters in time for them to vote in the election.

5. An in camera hearing would have been preferable due to the small size of Rota and the extraordinary impact political affiliation

tial evidence' standard, the Court [was] still left with the Board's egregious failure to notify and allow disqualified or transferred voters the opportunity to appeal its determinations concerning their eligibility to vote." *Id.* at 10. Thus the court found "that the Board, in an unprecedented and unpublished attempt to revise the challenge procedure, denied disqualified voters their right to appeal determinations concerning their eligibility." *Id.* The court therefore granted the improperly excluded voters the opportunity to vote in the election and ordered the Board to retabulate the results. Taitano won the seat, and three of the wrongfully excluded voters turned to the courts to redress their injuries.

## II. Prior Proceedings in This Action

In the CNMI Superior Court, Charfauros, Atalig, and Aldan raised a number of claims against the members of the Board of Elections in their official and individual capacities seeking both compensatory and punitive damages. Count one of the complaint charged the individual Board members with intentional infliction of emotional distress. Count two charged them with violations of 42 U.S.C. § 1983 in their official and individual capacities.[6] With respect to count two, the CNMI Superior Court ruled that the Board members enjoyed qualified immunity from liability in their individual capacities and therefore granted their motion for summary judgment. Although the court determined that the Board members were "persons" within the meaning of § 1983 acting under the color of CNMI law, it concluded that they

were entitled to qualified immunity because of the " 'objective legal reasonableness' of the [Board's] actions, assessed in the light of the legal rules that were 'clearly established' at the time it was taken." *Charfauros v. Board of Elections,* Civil Action No. 96–1106 at 5 (N. Mar. I.Commw.Super.Ct. May 29, 1997) (quoting *Danese v. Asman,* 875 F.2d 1239, 1242 (6th Cir.1989) (internal citations omitted)). The Superior Court concluded that a reasonable Board could have believed that establishing two classes of challenged voters—the Republican voters who were challenged by the Democratic Party and whose eligibility was reviewed before the election and the Democratic voters who were challenged by the Republican Party and whose eligibility was reviewed after the election—was reasonable given that the "procedure for resolving voter challenges was not 'clearly established' at the time the Board attempted to resolve the November 4, 1995 Rota election challenges." *Id.* at 7.

In so concluding, the Superior Court first reviewed how the Board of Elections historically dealt with challenges to voter eligibility. It discussed the regulations outlining the election and challenge process. According to the written regulations then in effect, voter qualification challenges must be raised by a registration clerk or a person authorized by the Board to register voters. *See id.* at 5 (citing Vol. 1 Com. Reg. No. 9 (June 16, 1979)). The challenger submits a written affidavit explaining the eligibility challenges before election day to the Board, which has the responsibility of evaluating the propriety and sufficiency of the information con-

has on the lives of its residents. *See infra,* note 9.

**6.** In its appeal to the CNMI Supreme Court, Appellees did not challenge (1) the entry of summary judgment for the Board on their § 1983 claim regarding the CNMI Constitution, (2) the entry of summary judgment for

the Board on their § 1983 claim in their official capacities, or (3) the denial of Charfauros's summary judgment motion. Here, because Appellees do not challenge the CNMI Supreme Court's decision to affirm summary judgment for the Board on the claim of intentional infliction of emotional distress, we do not address it.

tained in the voter's registration application and determining whether the voter met the requisite qualifications. If the challenges raised in the affidavit are questionable, the regulations require the Board to conduct a formal or informal hearing to evaluate the information and determine the voter's qualifications. *See id.* The regulations specify neither a particular time for the hearing nor a deadline for the decision. *See id.*

Next, the CNMI Superior Court reviewed its own decisions in election contest cases to highlight the serious flaws in the existing regulations. In *King v. Board of Elections*, No. 91–1191, 1991 WL 328471 (N. Mar. I.Commw.Super.Ct., Dec. 30, 1991), the Superior Court warned "the Board and the legislature that the election statute needs to be modified before the problems [with the procedures for challenging voters and resolving voter challenges] actually affect the result of an election."[7] *King*, No. 91–1191 at 12. The Superior Court reiterated the need to revise the election statute and challenge procedures in *Mendiola v. Taimanao, et al.,* No. 94–1002 (N. Mar. I.Commw.Super.Ct. March 15, 1994). Then, in *Taitano,* the predecessor to this action, the Superior Court's prediction in *King*—that an election's outcome would be affected by the flawed voter challenge procedure—came true as the Board made an "unprecedented and unpublished attempt to revise the challenge procedure" in the course of the election. *Taitano,* No. 95–1082 at 10. Although the Board knew there was a better procedure for the conduct of voter challenges, it was improper to change the challenge procedures midstream. Nevertheless qualified immunity for those actions was appropriate because the court's warn-

ings had resulted in a state of uncertainty among the Board regarding how voter challenges should be handled. Therefore, the procedures for resolving such challenges were not "clearly established" at the time the Board attempted to resolve the November 4 voter challenges. *Charfauros,* No. 96–1106 at 7. Reasoning thus, the Superior Court concluded that a reasonable Board could have believed "that the creation of two classes of challenged voters was reasonable," and as a result, they were shielded from civil liability in their individual capacities. *Id.*

The CNMI Supreme Court reversed, reasoning that the Superior Court erred by failing to first determine whether a constitutional violation occurred before addressing whether the right in question was clearly established. *See Charfauros v. Board of Elections,* Appeal No. 97–023 & 97–027 at 17, (N. Mar. I. Nov. 30, 1998). By failing to examine what, if any, constitutional right was at issue, the Superior Court misguidedly examined whether the challenge procedures were clearly established as opposed to whether the right to vote was clearly established. And because the challenge procedures themselves were a moving target, they could not possibly be clearly established.

Applying the correct analysis, the CNMI Supreme Court found that two rights were violated: (1) the right to vote, a fundamental political right, and (2) the right to equal protection of the laws. It further found that both rights were clearly established rights at the time of the violation. *See id.* at 17. These rights in combination provide "citizens [with] a constitutionally protected right to participate in elections on equal

---

7. To improve the election process, the court recommended that (1) if challenges are made on election day, the Board should not tabulate the results until the challenge has been re-

solved, and (2) oral challenges on election day should not be made until after the voter marks his or her ballot. *See King,* No. 91–1191 at 12–13.

basis with other citizens in the jurisdiction." *Id.* at 16 (quoting *Dunn v. Blumstein,* 405 U.S. 330, 336, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972)).

Because States have a compelling interest in regulating elections and promulgating reasonable voting qualifications, the CNMI Supreme Court next considered whether the Board's regulations were necessary to protect that compelling interest. It concluded that the Board's procedure was not necessary, expressly rejecting the Board's reasons for hearing only the challenges made by the Democratic Party. The Court found that Miguel Sablan's testimony did "not comport with the record ... about the actual process employed by the Board of Elections." *Id.* at 5. Contrary to Sablan's testimony, the Democratic Party's challenges in the record before it did not contain the voters' specific addresses outside Rota. Such information was in fact unnecessary because the Board mailed the hearing notices to the challenged voters' Rota addresses that appeared on their voter registrations. Thus, the failure of the Republican Party to include such information should not have prevented their challenges from being heard. Before making the decision to change the voter challenge process mid-election, the Board should have considered "[t]he short time frame between when the challenges were filed and when the election was held;" "[t]he ability of these voters to file and be heard upon an appropriate appeal;" and the "chilling effect on the right to vote on the part of persons challenged." *Id.* at 20. Because they failed to consider the effects of their decision and advanced untenable reasons for their actions, "the Board of Elections violated the

Plaintiffs' right to Equal Protection and equal access to the ballot." *Id.*

Turning to the question of whether the Board enjoyed qualified immunity from civil liability under § 1983, the Court concluded "that the impropriety of the Board's actions must have been readily apparent to any reasonable member" given the Superior Court's repeated warnings regarding the "inadequacy of the administrative regulations concerning elections." *Id.* at 23. It was disturbed by the Board's willingness to base their decisions on "woefully inadequate evidence" [8] and by the Chairman of the Board of Elections testimony that he had not read the Commonwealth's election laws in a "long, long time" and was, therefore, unfamiliar with the current law. *Id.* at 23–24. In light of all these circumstances, the CNMI Supreme Court did not believe that the Board acted in an objectively reasonable fashion. It therefore ruled that the Board was not entitled to qualified immunity and reversed the CNMI Superior Court's grant of summary judgment on their behalf. *See id.* at 24.

### III. The Constitutionally Protected Right to Vote

We agree with the CNMI Supreme Court that the right at issue here is the constitutionally protected right to vote, and that the Superior Court went astray by focusing on the procedures as set forth in the regulations, as opposed to Appellee's fundamental rights. Over a century ago, the United States Supreme Court held that the right to vote was a "fundamental political right." *Yick Wo v. Hopkins,* 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220

---

**8.** The CNMI Supreme Court suggested that if the "challenges were more 'specific' in a truly meaningful sense," such as a "sworn statement under penalty of perjury, or ... supporting documents ... demonstrating a prima

facie case of a person's residence in another jurisdiction," the categorization of voters might have passed constitutional muster. *Charfauros,* Appeal No. 97–023 & 97–027 at 23.

(1886). Because our democracy was founded on the principle that "the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights," *Reynolds v. Sims*, 377 U.S. 533, 562, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), our courts vehemently protect every citizen's right to vote, carefully and meticulously scrutinizing any alleged infringement. In 'addition to being guaranteed the right to vote, every United States "citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn*, 405 U.S. at 336, 92 S.Ct. 995.

■ Despite the strength of the Constitution's protection of this right, the United States Supreme Court has held that restrictions may be placed on the right to vote so long as "no discrimination is made between individuals, in violation of the Federal Constitution." *Carrington v. Rash*, 380 U.S. 89, 91, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) (citation omitted). Thus, if a State imposes regulations that disenfranchise voters, the regulations must be "appropriately defined and uniformly applied." *Dunn*, 405 U.S. at 343, 92 S.Ct. 995. In addition, the State must be pursuing an "important interest, [and] cannot choose means that unnecessarily burden or restrict constitutionally protected activity." *Id.*

■ The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution guarantees each and every person that they will not be denied their fundamental rights—including the right to vote—in an arbitrary or discriminatory manner. In addition to protecting the exercise of federal constitutional rights, the Equal Protection Clause also prevents violations of rights guaranteed to the people by state governments—including the government of CNMI. The CNMI Constitution provides CNMI residents not only the right to vote but the right to vote by secret ballot. VII N. Mar. I.Code § 1 (1997); I N. Mar. I Code § 6411. Thus, any restrictions placed on those rights must be scrutinized under the Equal Protection Clause. As the Supreme Court of the United States has held, "if a challenged statute grants the right to vote to some citizens and denies the franchise to others, 'the Court must determine whether the exclusions are necessary to promote a compelling state interest.'" *Dunn*, 405 U.S. at 337, 92 S.Ct. 995 (quoting *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 627, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969)). Therefore, the constitutional question presented here is "whether the Equal Protection Clause ... permits a State to discriminate ... among its citizens" based on who challenged their voter eligibility. *Id.* at 335, 92 S.Ct. 995. Phrased differently, we must determine whether the voter challenge procedures adopted by the Board "are consistent with its obligation to avoid arbitrary and disparate treatment of the members of its electorate." *Bush v. Gore*, 531 U.S. 98, 121 S.Ct. 525, 530, 148 L.Ed.2d 388 (2000).

## IV. 42 U.S.C. § 1983

We review the CNMI Supreme Court's reversal of a grant of summary judgment *de novo*. *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1047 (9th Cir.1995).

### A. Qualified Immunity

The Board argues that the CNMI Superior Court correctly determined that they were entitled to qualified immunity and therefore that summary judgment was appropriate. We disagree.

■ Government officials performing discretionary functions are entitled to qualified immunity when "their conduct

does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (quotations omitted). If an official "could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action." *Id.* at 819, 102 S.Ct. 2727. To defeat the Board's claim of qualified immunity, Appellees must establish that (1) the alleged conduct set out a constitutional violation and (2) the constitutional standard was clearly established at the time in question. *County of Sacramento v. Lewis,* 523 U.S. 833, 842 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *Siegert v. Gilley,* 500 U.S. 226, 231–32, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). If Appellees meet this burden, the Board nevertheless may be entitled to qualified immunity if it can show that a reasonable official would not have known that the conduct in question would violate Appellees' clearly established rights. *Gasho v. United States,* 39 F.3d 1420, 1438 (9th Cir.1994), *cert. denied,* 515 U.S. 1144, 115 S.Ct. 2582, 132 L.Ed.2d 831 (1995).

 Here, a constitutional violation occurred. Charfauros, Atalig, and Aldan were denied the right to vote, "a fundamental political right." *Reynolds,* 377 U.S. at 562, 84 S.Ct. 1362. Although the Board had a compelling interest in insuring that all voters were bona fide residents of Rota, *see Dunn,* 405 U.S. at 343, 92 S.Ct. 995, to pass the strict constitutional scrutiny applied in voting rights cases, the Board must show that its pre-election review of Democratic Party challenges but post-election review of Republican Party challenges was both necessary and narrowly tailored to serve this compelling interest. *Id.* at 337, 92 S.Ct. 995; *Olagues*

*v. Russoniello,* 797 F.2d 1511, 1521 (9th Cir.1986), *dismissed as moot,* 832 F.2d 131 (9th Cir.1987) ("Classifications that burden the right to vote can be upheld only if they are necessary to advance a compelling governmental interest ... Moreover, the classification must be closely tailored to effectuate only that interest.") (citations omitted); *see also Zablocki v. Redhail,* 434 U.S. 374, 388, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) ("When a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests."). The Board cannot demonstrate that its procedures were necessary or narrowly tailored, as they have not advanced even one credible justification for their actions.

The Board's purported justification for creating two classes of voters was that the Democratic Party's challenges, unlike the Republican's, were "pretty specific" and provided addresses outside of Rota where notice of the eligibility challenge could be sent. This rationale, however, is belied by the very letter in which the Democrats' challenges were made, as well as in the correspondence sent by the Board itself. The list of challenged voters submitted by the Democratic Party did not contain addresses any more specific than the region outside of Rota in which the challenged voters allegedly lived. No street addresses or post office box numbers were provided. Nor was such information necessary, as the Board did not send notices of voter challenges to any person at any address outside Rota. Every challenge notice was sent to the address listed on the challenged voters' registration application. It is not remotely credible, in light of the record before us, that the Board could not have sent notices to voters challenged by the Republican party at the addresses listed on their registration applications.

Moreover, in making the eligibility determinations, the Board did not conduct a thorough investigation. The record demonstrates that the Board relied almost exclusively on the testimony of one individual: the President of the Democratic Party, Herman A. Apatang. Apatang's "research" consisted of who he knew personally or recalled seeing on Rota. Although he may have inquired as to whether some of the contested voters owned Rota homesteads, Apatang admitted he had not done so in either Atalig's or Aldan's case. The record also demonstrates that both Senator Manglona and Jim Atalig testified that Appellees were living on Rota at the time of the election. Perhaps worst of all, the Chairman of the Board admitted that he was unfamiliar with the Board's own election laws—the very laws he was responsible for enforcing.

The Board does not explain what harm would have resulted if those individuals challenged by the Democratic Party had voted but would not have resulted if those challenged by the Republican Party did the same. Nor does it explain what harm would have resulted if all the challenged voters had been treated identically. Indeed, when the Board made its eleventh hour decision to allow the previously disqualified voters to vote, it instructed the polls to "make sure that [the challenged voters'] ballots be set aside" in case an appeal was made and their votes were again disqualified. The Board does not explain why this was an impractical solution for dealing with all the challenged voters from the outset. Because the means chosen to protect the state's compelling interest of ensuring all voters were bona fide Rota residents were neither nec-

essary nor narrowly tailored, we hold that Appellees' right to equal protection of the law was violated.

 Charfauros, Atalig, and Aldan were denied equal protection of the law in another—and perhaps, given the political environment in Rota—more significant way. Charfauros, Atalig, and Aldan were arbitrarily denied the right to cast a secret ballot, a right guaranteed to them by Section 6411(a) of the Northern Mariana Islands' Commonwealth Code, which provides:

> Each qualified voter has the right to cast a secret ballot in private. The board shall set up voting places to guarantee that each voter may vote in private.

I N. Mar. I.Code § 6411(a) (1997). It is well-established that once the legislature prescribes a particular voting procedure, the right to vote in that precise manner is a fundamental right, and "one source of its fundamental nature lies in the ... equal dignity owed to each voter." *Bush*, 121 S.Ct. at 529. Here, the legislature guaranteed to every voter the right to cast a secret ballot. Because Charfauros, Atalig, and Aldan were wrongly excluded from casting a secret vote on the day of the election, they were later required to proclaim in open court how they would have voted. That the election result changed after their votes were taken into account further publicized for whom they had voted. On a scarcely populated island where the elected Government employs a vast majority of the population, such disclosure can affect one's job, one's livelihood, or one's future possibilities for employment.[9]

9. Charfauros testified that his "place [of business] used to always be packed every morning" but that after the election he "lost a lot of customers ... [on] such a small island like this, little things can cost a lot of damage.

Politics is very strong out here." Aldan verified his perception of the political environment, testifying:

> Because of the voter challenge itself, it made it—it made it hard for us to find a

Putting such a price tag on the right to vote—particularly when only an arbitrarily selected few are forced to pay—violates the equal protection clause and is therefore unconstitutional.

■ Given the long line of cases protecting the fundamental right to vote in the context of Equal Protection challenges and given the clear language of the CNMI code, we hold that the fundamental right to vote, the right to a secret ballot, and the right to equal protection of the laws were clearly established at the time the violation occurred. Our holding is further strengthened by the fact that, in this particular case, the Board was on notice that its election challenge procedures were flawed and that it was in danger of violating the fundamental rights of Rota residents. *See King*, No. 91–1191 at 10.

■ Because Appellees have established that a constitutional violation occurred and that the constitutional rights involved were clearly established at the time of the violation, we must now determine whether the Board has shown that a reasonable elections official would not have known that treating voters differently based on their political party would violate the Equal Protection Clause.[10] The Board argues that it relied upon the advice of legal counsel. Such reliance alone, however, does not establish that a reasonable elections official would not know that his or her conduct violated the Equal Protection Clause. *See Lucero v. Hart*, 915 F.2d 1367, 1371 (9th Cir.1990) ("[R]eliance on counsel's advice will not satisfy a defendant's burden of acting reasonably. . . ."). Moreover, the record reflects only one meeting with counsel during which advice was given. This meeting occurred over breakfast on election day after the challenge hearings had been conducted and the voters had been notified of their ineligibility. This timing suggests that the decision to exclude the voters was not made upon the advice of counsel, but rather that counsel was notified after the fact. It also suggests, when considered with the fact that immediately following the breakfast meeting the Board notified the polls that the previously deemed ineligible voters were now eligible to vote, that counsel advised the Board that its actions to that point had not been legally acceptable.

■ Assuming, for the sake of argument, that the Board implemented its first pre-election voter challenge process after having consulted counsel, a reasonable Board nevertheless would have known that the discriminatory voter challenge review process employed would violate the Equal Protection Clause.[11] First, as early as

living . . . we can't get into a government employment. So, in the private firms, it made it—it made it harder . . . to go out and look for a job . . . Democrats judging you for being a Republican and not wanting you to be, why go to—why go to work somewhere were you're not gonna be—you're not gonna be welcome, where they're gonna put you through so much stress that it would make you not wanna be there.

10. The Board misstates this standard in their brief. The issue is not "whether the Board *intentionally* violated well-established equal protection rights in making these difficult de-

terminations," but whether a reasonable official *would have known* that his act violated equal protection. *Gasho*, 39 F.3d at 1438 (emphasis added).

11. In order to establish § 1983 liability at trial, Appellees must show that the Board violated the Equal Protection Clause, which "require[s] purposeful discrimination." Sheldon H. Nahmod, Civil Rights and Civil Liberties Litigation § 3:2 (4th ed.1999). Because we are reviewing the grant of summary judgment on the grounds of qualified immunity, nothing in this decision should prohibit the Board from raising reliance on the advice of

1991, the CNMI Superior Court had warned the Board that the voter challenge provisions of the election statute were seriously flawed. *See King,* No. 91–1191; *Mendiola,* No. 94–002. The *King* court specifically warned that the voter challenge system, as it was implemented, could violate the fundamental right to vote freely, a right which "is the essence of a democratic society." *King,* No. 91–1191 at 10 (quoting *Reynolds,* 377 U.S. at 555, 84 S.Ct. 1362). Given that the Board was notified that the voter challenge process could deny the residents of Rota the fundamental right to vote, a reasonable Board would have taken care to ensure that any actions taken pursuant to the regulations did not threaten that fundamental right. *See Harlow,* 457 U.S. at 819, 102 S.Ct. 2727 (If "an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action.").

Second, the Chairman of the Board testified in his deposition that he had reviewed the election laws a "long, long time ago," but that he was not familiar with the law at the time of the voter challenges. A reasonable Board member, particularly the Chairman of the Board, would have been familiar with the regulations he was charged with enforcing.

Third, concluding that the Board's decision to exclude the voters was not supported by substantial evidence, the Superior Court in *Taitano* stated:

the Board relied almost exclusively on the "research" of Herman Apatang in making its determinations concerning voter eligibility, and that such "research" amounted to little more than reliance on who Mr. Apatang knew personally or recalled seeing on Rota in the weeks preceding the November election. Not only was Mr. Apatang's research insubstantial, but it was, in several cases, demonstrated to be incorrect. Sound judgment is a fairly sturdy standard and the mere chance that the agency's judgment is correct is not enough.

*Taitano,* No. 95–1082(R) at 9. A reasonable Board would not have relied upon the subjective testimony of one individual, who clearly was interested in the outcome of the hearing,[12] unsupported by empirical evidence, before determining a voter's eligibility, but, instead would have chosen an alternative procedure that would have "avoid[ed] arbitrary and disparate treatment of the members of its electorate." *Bush,* 121 S.Ct. at 530.

Finally, the Board changed its procedures twice during the election. It did not adhere to the original regulations, but adopted a new procedure which omitted a pre-election appeals process. When notified of that defect by its counsel, the Board suddenly changed the procedures again, deciding on the morning of the election that the votes could be cast, but would be set aside. Once having made that decision, it inexplicably failed to inform the voters who had previously been notified of their ineligibility. As a result, none of the challenged voters voted.

A reasonable Board would have known its actions violated the fundamental rights to vote and to equal treatment under the

counsel as a defense to the equal protection violation.

**12.** Apatang was the head of the Democratic Party. He was also the person who wrote the letter challenging Appellees' right to vote in

the election. A reasonable Board would have considered Apatang's motivation to see his challenge succeed in determining whether to rely almost exclusively on Apatang's testimony to disqualify the voters he challenged.

**956**

law. "The decision to rush these hearings on such little notice, with such little time before the election, with no opportunity for appeal, upon such weak evidence was inept. To describe this process as merely negligent is too generous. It was, in the words of the trial court in *Taitano v. Mundo,* 'egregious.'" *Charfauros,* Nos. 97–023 & 97–027 at 24. Therefore, we agree with the CNMI Supreme Court that the Board is not entitled to qualified immunity and that summary judgment was inappropriate.

### B. § 1983 Individual Capacities

■ The United States Supreme Court has held that individuals may be sued under 42 U.S.C. § 1983 in their personal capacity for actions taken under color of state law.[13] To establish a claim of personal liability under § 1983, the injured party must show that an "official, acting under color of state law, caused the deprivation of a federal right." *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).

■ The Board does not dispute that § 1983 provides a cause of action against government officials in their individual capacities, but instead claims that Appellees "failed to make any allegations against the Board members in their individual (as opposed to official) capacities." Although the allegation made by Appellees fails as a model of clarity, we disagree that it fails to allege claims against the members of the Board of Elections "as individuals."

Paragraph 55 of the complaint states:

Each and all of the acts of Defendants alleged herein were done by Respondents/Defendants, and each of them, not as individuals, but under the color and presence of the statute and regulations of the Commonwealth and under the authority of their office as individual members of the Board in the Commonwealth.

■ The Board members argue that *Bisom v. CNMI,* No. 95–0042 (D.N. Mar. I. Nov. 6, 1996), in which the court granted the defendants judgment on the pleadings because the plaintiff failed to plead allegations against defendants in their individual capacities, controls this issue. There, however, only the caption contained any reference to the defendants' individual capacities. Here, both the caption and the complaint itself can be read to allege violations by the Board members in their individual capacities. Appellees allege in paragraph 55 that the Board members were acting "under the authority of their office as individual members of the Board." Taken in context, the phrase "not as individuals" in the same sentence is not an allegation that the Board members were acting in their official capacity. Rather, the phrase "not as individuals" appears to have been included to clarify that the Board was acting under the color of CNMI law—a prerequisite for § 1983 liability—as opposed to outside the authority of their office. This interpretation is supported by the next phrase in the complaint: "under the color and presence of the statute and regulations of the Commonwealth." As the *Bisom* court noted, we should "construe pleadings to do substantial justice" and give the plaintiff "the benefit of the doubt if his pleading makes

---

**13.** 42 U.S.C. § 1983 provides in relevant part: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

out any claim for relief." *Id.* at 5. We therefore hold that Appellees successfully alleged a § 1983 complaint against the Board members in their individual capacities.

### V. Special Judge Panel

██ The Board argues that the composition of CNMI Supreme Court's Special Judge panel, consisting of two practicing CNMI attorneys with pending litigation against CNMI and one retired supreme court justice, violated their right to due process of law. Because the Board did not raise this issue in a timely fashion before the CNMI Supreme Court, they may not raise it here. *See Davis v. Fendler,* 650 F.2d 1154, 1163 (9th Cir.1981) (holding that a failure to challenge a judge's bias in a timely fashion prohibits its consideration on appeal); *see also Ainsworth v. Combined Ins. Co. of America,* 105 Nev. 237, 774 P.2d 1003, 1019 (1989) (concluding that petitioner "waived its right to raise these issues at this late date because its counsel, knowing the subsequently asserted factual basis for these allegations, did not promptly tender an objection to this court, but instead remained silent and gambled on the outcome of the appeal"), *modified on other grounds, Powers v. United Servs. Auto Ass'n,* 114 Nev. 690, 962 P.2d 596, 605 (1998).

CNMI law which sets forth the procedural requirements for judicial disqualification supports our conclusion. Section 3309(b) of the Northern Mariana Islands Commonwealth Code provides:

> Whenever a party to any proceeding in a court of the Commonwealth believes that there are grounds for disqualification of the justice or judge before whom the matter is pending, that party may move for disqualification of the justice or judge, stating specifically the grounds for such disqualification.

By permitting parties to move for disqualification of the "judge before whom the matter is pending," this statute creates a process whereby issues of disqualification should be raised before the judge in question. This gives the challenged judge the opportunity to rule on the disqualification issue, and an appeal to be taken, before the judge rules on the merits of the action.

In *Gil Enterprises, Inc. v. Delvy,* 79 F.3d 241, (2d Cir.1996), the Second Circuit explained the policy rationale for requiring disqualification motions at the first possible moment:

> "it is important to present recusal applications promptly for at least two reasons. First, a prompt application affords the district judge an opportunity to assess the merits of the application before taking any further steps that may be inappropriate for the judge to take. Second, a prompt application avoids the risk that a party is holding back a recusal application as a fall-back position in the event of adverse rulings on pending matters."

*Gil Enterprises, Inc.,* 79 F.3d at 247 (quoting *In re International Bus. Mach. Corp.,* 45 F.3d 641, 643 (2d Cir.1995)). The judges on the CNMI Supreme Court panel were never given the opportunity to recuse themselves if they deemed it necessary after considering the Board's objections.

██ The right to an impartial decision maker is a fundamental right which requires due process of law before it is denied. *See Goldberg v. Kelly,* 397 U.S. 254, 271, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). However, "[p]rocess is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." *Olim v. Wakinekona,* 461 U.S. 238, 250, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983);

*Zinermon v. Burch,* 494 U.S. 113, 125–26, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) ("In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law."). The Board did not follow the disqualification procedures set forth in the statute. Because it did not do so, the Board has waived any challenge to the special judge panel.

## VI. Conclusion

For the foregoing reasons, the decision of the CNMI Supreme Court is AFFIRMED.