79 F.3d 241
 38 U.S.P.Q.2d 1042
 GIL ENTERPRISES, INC., Plaintiff-Appellant-Cross-Appellee,
v.
Richard DELVY, doing business as Miraleste Music,
Defendant-Appellee-Cross-Appellant.
Richard DELVY, Counter-Claimant,
v.
GIL ENTERPRISES, INC., Counter-Defendant.
 No. 47, Dockets 94-9265, 94-9305.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 6, 1995.
Decided March 12, 1996.
 
 Appeal from a judgment entered in the United States District Court for the Southern District of New York (Lowe, J.), denying in its entirety plaintiff-appellant's complaint and granting defendant-appellee's counterclaim declaring the contract between the parties validly terminated. Reversed and remanded.
 Scott L. Baker, Silverman & Shulman, P.C., New York City (Jonathan J. Ross, on the brief), for plaintiff-appellant.
 Robert W. Cinque, Cinque & Cinque, P.C., New York City (James P. Cinque, on the brief), for defendant-appellee.
 Before WINTER, ALTIMARI and McLAUGHLIN, Circuit Judges.
 ALTIMARI, Circuit Judge:
 
 
 1
 Plaintiff-appellant Gil Enterprises, Inc. ("Gil") appeals from a judgment entered in the United States District Court for the Southern District of New York (Lowe, J.), denying in its entirety plaintiff-appellant's complaint alleging, among other things, breach of contract and tortious interference with a business relationship against defendant-appellee Richard Delvy ("Delvy") (d/b/a "Miraleste Music") and granting Delvy's counterclaim declaring his contract with Gil validly terminated. Gil contends on appeal that 1) the district court erred in determining that a sufficient "demand" had been made upon Gil to justify termination of the contract; 2) the district judge erred in failing to disqualify herself from presiding over the bench trial; and 3) the co-owner of the copyright under the contract was an indispensable party without whom a judgment could not properly be entered. While we find Gil's latter two arguments meritless, the district court mistakenly concluded that Delvy made a "demand" upon Gil within the meaning of the Agreement. Accordingly, we reverse and remand for proceedings consistent with this opinion.
 
 BACKGROUND
 
 2
 Gil is a New York corporation that exploits music copyrights throughout the world. On May 24, 1963, Gil entered into a contract (the "Gil Agreement" or "Agreement") with Richard Delvy and John Marascalco ("Marascalco") (d/b/a "Robin Hood Music Co.") (collectively the "Owners"), the co-owners of the copyright to the popular song "Wipe Out" (the "Composition"). Under the Gil Agreement, Gil acquired the exclusive rights to exploit the Composition throughout the British Commonwealth of Nations and Mandated Territories (including Canada), the Republic of Ireland, and South Africa (collectively the "Licensed Territories") for the life of the copyright.
 
 
 3
 Under the terms of the Gil Agreement, Gil retained 50% of the royalties acquired through the exploitation of the Composition. By 1988, it became clear to the Owners that modern sub-licensing contract rates were significantly lower than 50%. Accordingly, the Owners sought to renegotiate their Agreement with Gil. When Gil refused to renegotiate, the Owners declared that the Agreement was terminated and entered into a new distribution agreement under more favorable terms with Minder Music Limited.
 
 
 4
 When the Owners terminated the Agreement, Gil filed suit in New York Supreme Court alleging, among other things, breach of contract and tortious interference with a business relationship. Ultimately, Marascalco, who was reluctant to join in any legal action against Gil, entered into a settlement agreement with Gil. Under the settlement agreement, Marascalco was paid several thousand dollars in past royalties plus interest in exchange for a sworn affidavit stating:
 
 
 5
 I can unequivocally state that I have been duped by Delvy into believing that Gil had breached the terms of the Subpublication Agreement and that [he] could effectively terminate same and that a new and better deal could be made for us with respect to the exploitation of the Composition in the Licensed Territory.
 
 
 6
 * * *
 
 
 7
 On behalf of Robin Hood, I state and represent that insofar as the interests of Robin Hood are concerned with respect to the Composition, the Subpublication Agreement has not been breached and that it has not been terminated nor has it expired.
 
 
 8
 After settling the suit with Marascalco, Gil dropped the New York State action and reinstated the suit in federal court, this time only against Delvy. Delvy counterclaimed, seeking a declaration that the Agreement had been legally terminated and that Gil has no further right to exploit the Composition.
 
 
 9
 The federal action was tried before Judge Mary Johnson Lowe. Throughout the trial, Judge Lowe excoriated Gil's attorney for engaging in improper questioning and acting in bad faith. After one instance of such questioning mid-trial, Judge Lowe stated:
 
 
 10
 Look, this has constantly been one problem after another. This [is] a non-jury trial. And I think that I'm going to just declare a mistrial here, send this to somebody else, and let them try it, I cannot go on this way, I think, because this plaintiff and this defendant are entitled to a fair and impartial trial.
 
 
 11
 And you know, normally, Mr. Shulman, I find that your conduct in this trial has just made it necessary for me to constantly stop you from doing things that you have just done. You do it repeatedly. You are not conducting this as a trial. And if I am going to render an impartial judgment, I am really upset by the way you are conducting it. And I cannot say as I sit here now that I can be fair because of the way you have conducted this trial.
 
 
 12
 Let me talk to you, both of you, in chambers.
 
 
 13
 In chambers, Judge Lowe discussed her frustration with Gil's attorney. Thereafter she made no further comments as to her ability to remain impartial in judging the dispute before her. She completed the trial and ultimately rendered a verdict against Shulman's client, Gil, granting Delvy's counterclaim declaring the Agreement lawfully terminated.
 
 
 14
 In post-trial submissions, Gil (the plaintiff) asserted that the district court did not have the authority to enter judgment in the case because of the failure to join an indispensable party (Marascalco) under Fed.R.Civ.P. 19 ("Joinder of Persons Needed for Just Adjudication"). The district court rejected this contention, in part due to the fact that Gil was fully aware of the existence of the "indispensable" party when it filed suit.
 
 
 15
 Gil now appeals, contending that 1) the district court erred in determining that a sufficient "demand" had been made upon Gil to justify termination of the Agreement; 2) the district judge erred in failing to disqualify herself from presiding over the bench trial; and 3) the co-owner of the copyright under the Agreement was an indispensable party without whom a judgment could not properly be entered.
 
 DISCUSSION
 I. "Demand" For Accounting
 
 16
 The Gil Agreement contains several provisions concerning the accounting and reporting required under the Agreement. The relevant paragraphs provide as follows:
 
 
 17
 9. True and correct accounts shall be kept by the [Subpublisher (Gil) ], and a statement of such account as of December 31st and June 30th in each year shall be mailed to the Owner [ (Delvy and Marascalco) ] within sixty (60) days after each of said dates, whether or not any money is then due to Owner.
 
 
 18
 * * *
 
 
 19
 10. .... In the event of the failure of the [Subp]ublisher to furnish such statement of account to the Owner on the dates herein provided or in the event of the failure of the [Subp]ublisher to make payment to the Owner of any royalties due hereunder, and if the [Subp]ublisher shall thereafter fail to furnish such statements or make such payments required hereunder within sixty (60) days after receipt of written demand therefor from the Owner, the Owner shall have the right to terminate this agreement in writing effective as of any time after the end of such sixty (60) days waiting period .... (emphasis added)
 
 
 20
 According to the district court, Delvy properly terminated the Gil Agreement after making a "demand" for an accounting under Paragraph 10, with which Gil failed to comply.
 
 
 21
 The district court considered several pieces of correspondence which it viewed, in total, to justify Delvy's termination of the Gil Agreement. In a letter dated August 1, 1988, Delvy's attorney notified Gil that Delvy and Marascalco were terminating the Agreement:
 
 
 22
 Please refer to [the Gil A]greement dated May 24, 1963 between Miraleste Music and Robin Hood Music Company on the one hand ("Licensor") and Gill [sic] Enterprises, Inc. on the other hand ("Licensee") with respect to the musical composition entitled "Wipe Out".
 
 
 23
 Said agreement is hereby terminated by Licensor effective immediately by reason of Licensee's material breaches of said agreement.
 
 
 24
 On August 10, 1988, Gil replied to the termination letter as follows:
 
 
 25
 My lawyer tells me he received a letter from your lawyer ... dated August 1, 1988 in which [your lawyer] tells us that our WIPE OUT subpublication contract "is hereby terminated"....
 
 
 26
 I don't have to tell you that lawyers don't have magic wands which they can wave and magically terminate a contract.
 
 
 27
 Anyone who takes action relying on the waving of such a magic wand is leaving himself open to lots of legal consequences. You should be guided accordingly because our contract remains in full force.
 
 
 28
 Some time later, on November 29, 1988, Delvy wrote to Gil seeking additional information concerning Gil's royalty payments. The district court construed that letter to be a "demand" under Paragraph 10 of the Agreement. The November 29th letter stated:
 
 
 29
 We apologize for our delay in responding sooner to your letter of August 10, 1988, and both John [Marascalco] and I note your comment about "waving a magic wand" but we don't feel that this is same the [sic] situation. Our attorney Mr. Alfred "Kim" Guggenheim has advised us of our position and we suggest you confer with him.
 
 
 30
 * * *
 
 
 31
 In any event we are in need of some additional information for our writers and records. Additional information is needed to supplement your statements ending December 31st, 1996, June 30th 1987 and December 31st, 1987.
 
 
 32
 Please advise us as to the to the [sic] number of units sold for each recording, plus the relevant source of sales. Could you please have this information broken down by territories. (emphasis added)
 
 
 33
 Finally, when Gil failed to respond to the November 29th letter, Delvy's attorney again notified Gil that Delvy and Marascalco terminated the Agreement, this time for failure to provide the accounting information demanded. In his February 3, 1989 letter, Delvy's attorney wrote:
 
 
 34
 This is to advise that no reply has been received to Mr. Delvy's letter of November 29, 1988, requesting important accounting information. Pursuant to paragraph 7 of the subject agreement, royalties must be computed and accounted for separately as to each country as to the respective royalties under paragraph[s] 5 and 6.
 
 
 35
 Mr. Delvy's letter of November 29, 1988 clearly constitutes his request for correct statements pursuant to paragraph 10 of the agreement which request you have failed and refused to honor. Such failure and refusal after sixty days prior written notice authorizes Miraleste Music Company and Robin Hood Music Company to terminate the agreement.
 
 
 36
 In light of the fact that you have refused to honor the prior valid termination of the agreement founded upon the numerous material breaches of the contract heretofore discussed, this letter constitutes additional notification of termination for the reasons set forth above.
 
 
 37
 In light of the correspondence above, the district court determined that Delvy had made a sufficient "demand" under Paragraph 10 of the Agreement as to justify termination of the subpublication contract. Specifically, the district court stated that "a demand may be defined as 'a request addressed to a person that he will do some act which he is legally bound to do, after the request has been made.' " D.Ct.Op. at 16, 1993 WL 535011 at * 7 (quoting In re Baltimore Pearl Hominy Co. (Guaranty Trust Co. of New York v. McKenrick), 5 F.2d 553, 555 (4th Cir.1925)). In applying this definition, the district court found that Gil had a continuing duty to make semi-annual accountings on a country by country basis. The district court determined that Delvy's November 29th letter asking for additional information was a request for specific accountings to which he was legally entitled and was therefore a "demand" within the meaning of the Agreement. It was not necessary, according to the district court, for Delvy "to remind Gil that his claim of right to the statements request was pro haec verba set forth in the Gil Agreement itself." D.Ct.Op. at 18, 1993 WL 535011 at * 8. Accordingly, because Gil did not respond to the request for accounting within sixty days, the district court held that Delvy legitimately terminated the Agreement by letter dated February 3, 1989.
 
 
 38
 The district court further held that even if the November 29th letter was not itself a demand, "the record shows that the attorney for the Owners wrote Gil on February 3, 1989 stating that the Gil Agreement was cancelled for failure to comply with the information requested on November 29th.... Reading the November 29th and February 3rd letters together, there is clearly more than a preponderance of credible evidence that on receipt of the February 3rd letter, Gil was on notice that the sixty day period had begun to run." D.Ct.Op. at 19, 1993 WL 535011 at * 8. Because Gil failed to comply fully with the accounting request, even after receiving the February 3rd letter, the district court determined that the Agreement was terminated as of sixty days after February 3rd.
 
 
 39
 We review the district court's construction of contract language de novo. See Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank, 57 F.3d 146 (2d Cir.1995); Kidder, Peabody & Co. v. Zinsmeyer Trusts Partnership, 41 F.3d 861 (2d Cir.1994). By our reading, neither the November 29th letter nor that letter in combination with the February 3rd letter amounted to a "demand" within the meaning of the Agreement.
 
 
 40
 Although it is clear that a demand for accounting need not use the specific language "demand" to trigger the contracting parties' respective rights and obligations, see Carvel Corp. v. Diversified Management Group, Inc., 930 F.2d 228, 233 (2d Cir.1991); Hoche Productions, S.A. v. Jayark Films Corp., 256 F.Supp. 291, 295 (S.D.N.Y.1966), it is less obvious exactly what language is sufficient to trigger legal consequences.
 
 
 41
 Those courts that have sought to define that which constitutes a demand, including this Court, have tended to rely upon opaque dictionary definitions. See, e.g., Zimmerman v. Hicks, 7 F.2d 443, 445 (2d Cir.1925) (quoting 3 Bouv. Law Dict. p. 2904), aff'd, 274 U.S. 253, 47 S.Ct. 625, 71 L.Ed. 1034 (1927); Baltimore Pearl Hominy Co., 5 F.2d at 555 (4th Cir.1925) (quoting R. & L. Law Dictionary, p. 369). While these dictionary definitions make clear that a demand requires an imperative solicitation for that which is legally owed, see, e.g., Gershman v. Barted Realty Corp., 22 Misc.2d 461, 198 N.Y.S.2d 664, 665-66 (Sup.Ct.1960) (letter seeking to trigger mortgage acceleration clause not a "demand" because it failed to "indicate that the request [was] made under a claim of right under the mortgage, nor [did] it request compliance therewith"), they do little to distinguish between a demand and a mere request which carries no legal consequences. To make such a distinction, it is necessary to look to the purpose of a demand.
 
 
 42
 By its nature, a demand is intended to trigger certain rights and obligations. In the case at hand, under Paragraph 10 of the Agreement, the Owners may terminate the Agreement if Gil fails to provide a statement of account or royalties owed within sixty days of a written demand. In order to prompt such rights and obligations, it is necessary that the party upon whom the demand is being made be put on notice that those legal obligations have been triggered. Without notice, the demand would serve no purpose because it would fail to provide Gil with the opportunity to cure any accounting shortfalls. Accordingly, the gravamen of a legal demand is its notice providing function. Cf. Empresa Cubana Exportadora de Azucar y Sus Derivados v. Lamborn & Co., Inc., 652 F.2d 231, 234 n. 7 (2d Cir.1981) ("demand ... was sufficient to put [appellant] on notice"); Peninsular & Oriental Steam Navigation Co. v. Overseas Oil Carriers, Inc., 553 F.2d 830, 835 n. 3 (2d Cir.) ("Although the parties have stipulated that the letter was not a demand for payment, it was sufficient to put [appellees] on notice that the services were not intended as a gratuity."), cert. denied, 434 U.S. 859, 98 S.Ct. 183, 54 L.Ed.2d 131 (1977); Sun Shipbuilding Dry Dock Co. v. United States Lines, Inc., 439 F.Supp. 671, 678 (E.D.Pa.1977) ("[Plaintiff's] submission of its final estimate ... put [defendant] on notice of the amount [plaintiff] claimed."), aff'd, 582 F.2d 1276 (3d Cir.1978), cert. denied, 439 U.S. 1073, 99 S.Ct. 846, 59 L.Ed.2d 40 (1979).
 
 
 43
 Because Delvy's letter of November 29th was insufficient to put Gil on notice that failure to comply with the request for additional information could result in termination of the Agreement, it did not constitute a demand within the meaning of Paragraph 10. Although Delvy's letter of November 29th contained some imperative language ("we are in need of some additional information"), it also contained precatory language ("Please advise "). Such ambiguous statements did not rise to the level of a demand, because they objectively failed to put Gil on notice of the drastic legal repercussions that could result from noncompliance. While Delvy was neither obliged to instruct Gil of the specific consequences of failing to supply the information sought in the November 29th letter, nor required to indicate that he was making a "demand" under the Agreement, his letter needed to be sufficiently imperative as to put Gil on notice that it was more than a mere request for information.
 
 
 44
 The November 29th letter by its very terms was written after Delvy had consulted with counsel and advised Gil that Delvy continued to view the Agreement as terminated by the August 1st letter. It even advised Gil to confer with Delvy's attorney regarding that issue. In that context, the words "[i]n any event we are in need of some additional information ..." hardly gave Gil notice that a cure period was being triggered. The November 29th letter, read as a whole, was better calculated to lead Gil to believe that the termination dispute turned entirely on the effect of the August 1st letter than to inform Gil that Paragraph 10 of the Agreement would, if compliance was not forthcoming, be invoked as an independent grounds for termination. Indeed, if Delvy's position was, as stated in the November 29th letter, that the Agreement had been terminated in August, Gil had no reason whatsoever to understand that Delvy was attempting to invoke a provision of what Delvy insisted was a terminated contract. We do not hold that Delvy could not invoke Paragraph 10 while relying in the alternative on the August 1st letter. We say only that, if that was Delvy's intent, it had to state so expressly in the November 29th letter. The November 29th letter was, therefore, not a demand within the meaning of Paragraph 10 of the Agreement.
 
 
 45
 It is equally clear that the combination of the November 29th and February 3rd letters did not amount to a demand. Even if the February 3rd letter made clear that the November 29th letter was intended to be a demand, it in no way put Gil on notice that it then had sixty days to comply with the demand for an accounting; rather, the February 3rd letter informed Gil that, even if it had desired to do so, it was too late to comply with Delvy's demand and avoid nullification of the Agreement. Accordingly, the district court erred in finding that Delvy had cause to terminate the Agreement under Paragraph 10.
 
 II. Disqualification
 
 46
 For the first time, Gil now seeks to disqualify the trial judge for what it asserts was evident bias. Midway through the bench trial, as described above, Judge Lowe threatened to declare a mistrial as a consequence of her increasing exasperation with the tactics of Gil's attorney. Gil now asserts that it was error for Judge Lowe not to disqualify herself after apparently admitting that she was sufficiently biased as to no longer maintain impartiality.
 
 
 47
 This Court has made clear that recusal motions are to be made "at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim." Apple v. Jewish Hosp. and Medical Ctr., 829 F.2d 326, 333 (2d Cir.1987). As we recently explained,
 
 
 48
 "it is important to present recusal applications promptly for at least two reasons. First, a prompt application affords the district judge an opportunity to assess the merits of the application before taking any further steps that may be inappropriate for the judge to take. Second, a prompt application avoids the risk that a party is holding back a recusal application as a fall-back position in the event of adverse rulings on pending matters."
 
 
 49
 In re International Bus. Mach. Corp., 45 F.3d 641, 643 (2d Cir.1995) (" In re IBM") (emphasis added). In the face of defeat, Gil now seeks to do just that which this Court warned against in In re IBM and use its post-hoc recusal motion as a "fall-back position." Since Gil's objection was raised well later than "the earliest possible moment," and because Gil has failed to demonstrate any bias on the part of the district court beyond Judge Lowe's own expressed frustration, we reject this ground for relief. We note, however, that this determination does not prevent Gil from seeking Judge Lowe's recusal on remand if it should choose to do so.
 
 III. Indispensable Party
 
 50
 Finally, Gil argues that the decision below is marred by a procedural defect--according to Gil, "[e]ven if the court had found (or were to find on remand) that Robin Hood initially consented to Miraleste's efforts to terminate the Gil Agreement, such claim could not be heard in Robin Hood's absence since Robin Hood objects to such termination and is an indispensable party to this litigation." Despite being fully aware of the indispensability of Delvy's co-copyright owner as a party to the litigation from its inception, Gil did not raise this procedural defect until the close of trial and in post-verdict submissions.
 
 
 51
 This Court will only reverse the district court's failure to join a party for abuse of discretion. See Arkwright-Boston Mfrs. Mut. Ins. Co. v. City of New York, 762 F.2d 205, 209 (2d Cir.1985); Envirotech Corp. v. Bethlehem Steel Corp., 729 F.2d 70, 75 (2d Cir.1984). In light of the late date at which Gil raised this procedural defect and the fact that Gil, as plaintiff, itself failed to join the indispensable party in question, we find no abuse of discretion below. See Judwin Properties, Inc. v. United States Fire Ins. Co., 973 F.2d 432, 434 (5th Cir.1992) (plaintiff's own failure to join an indispensable party may not be used offensively); Arnold v. BLaST Intermediate Unit 17, 843 F.2d 122, 125 n. 6 (3rd Cir.1988) ("[Appellant's] Rule 19 claim is ... barred by the equitable principle of laches here, where [appellant] itself failed to join the [indispensable party] despite ample opportunity.").
 
 CONCLUSION
 
 52
 For the reasons stated above, the district court's determination that Delvy made a valid demand is reversed and this case is remanded for such further proceedings as are necessary, consistent with this opinion.