Reversed and remanded by published opinion. Judge AGEE wrote the opinion, in which Judge NIEMEYER joined. Judge WYNN wrote a dissenting opinion.
AGEE, Circuit Judge:
National Union Fire Insurance Company of Pittsburgh, PA (“National Union”) and ACE American Insurance Co. (“ACE” and together with National Union, the “Insurers”) appeal from the district court’s grant of partial summary judgment in favor of Millennium Inorganic Chemicals Ltd. and Cristal Inorganic Chemicals Ltd. (collectively, “Millennium”). Millennium sued the Insurers in the United States District Court for the District of Maryland, contending that the Insurers had wrongfully denied Millennium’s claim for coverage under contingent business interruption provisions of commercial liability insurance policies issued by the Insurers. The district court granted partial summary judgment in favor of Millennium after concluding that certain terms in the policies were ambiguous and that the doctrine of contra proferentem, therefore applied. For the reasons set forth below, we reverse the judgment of the district court and remand for entry of summary judgment in favor of the Insurers.
I
A. The Insurance Policy Provisions
In 2008, Millennium enlisted the help of Marsh USA, Inc. (“Marsh”), an insurance *281 brokerage firm, to secure a commercial liability insurance policy including contingent business interruption (“CBI”) insurance coverage.[1] Marsh solicited bids from a number of insurers, including National Union and ACE, seeking CBI coverage and outlining the coverage specifications Millennium sought, specifically stating only that it required coverage “for direct suppliers/customers.” (J.A. 1193.) In response, National Union’s quote provided, “THERE SHALL BE NO COVERAGE FOR INDIRECT SUPPLIERS/RECIPIENTS.” (J.A. 1209.) ACE also offered a quote, providing policy limits only for “direct” suppliers. (J.A. 1217.)
Millennium chose to purchase its commercial coverage, including the CBI endorsement, from National Union and ACE, each of which would bear responsibility for 50% of Millennium’s covered losses, up to specified limits. As pertinent to the CBI coverage, National Union issued a Binder of Insurance (a “Binder”), which stated, “THERE SHALL BE NO COVERAGE FOR INDIRECT SUPPLIERS/RECIPIENTS.” (J.A. 1289.) The National Union Binder also provided a sublimit on liability for “DIRECT CONTRIBUTING OR RECIPIENT PROPERTY(IES).” (J.A. 1287.) Likewise, ACE issued a Binder that provided a similar sublimit on “ ‘Direct’ Contingent Time Element[s].” (J.A. 1305.) Neither Binder provided any coverage for “indirect” suppliers.
Shortly after issuing the Binders, National Union and ACE separately issued policies to Millennium (the “Policies”) with essentially identical terms. Each policy included an Endorsement titled “CONTINGENT BUSINESS INTERRUPTION CONTRIBUTING PROPERTY(IES) ENDORSEMENT” (the “Endorsements”). (J.A. 1392, 1496.) The Endorsements insured Millennium against certain losses resulting from the disruption of the supply of materials to Millennium caused by damage to certain “contributing properties.”[2] (J.A. 1392, 1496.) Specifically, Section C of the Endorsements defined events of coverage as insurance
only against loss directly resulting from necessary interruption of business conducted on premises occupied by [Millennium], caused by damage to or destruction of any of the real or personal property described above and referred to as CONTRIBUTING PROPERTY(IES) and which is not operated by [Millennium], by the peril(s) insured against during the term of this Policy, which wholly or partially prevents the delivery of materials to [Millennium] or *282 to others for the account of [Millennium] and results directly in a necessary interruption of [Millennium’s] business.
(J.A. 1392, 1496.) “Contributing Properties” in Section C of the Endorsements was thus defined by reference (“described above”) to the preceding Section B, which establishes that only a “direct supplier of materials to the Insured’s locations” can be a “contributing property.” Section B provided a “SCHEDULE OF LOCATION(S),” (the “Schedules”) in which Millennium could list any “contributing property” that created a risk of business interruption. (J.A. 1392, 1496.)
A general section of each of the Policies set policy sublimits and provided that any direct contributing properties named in the Schedules were covered for $25 million, while any unnamed direct contributing properties were covered for $10 million. Millennium did not list any contributing properties on the provided Schedules. The Endorsements also each contained a loss-mitigation provision requiring Millennium to “use [its] influence to induce the CONTRIBUTING PROPERTY(IES) to make use of any other machinery, equipment, supplies or location available in order to resume operations and delivery of materials to [Millennium].” (J.A. 1393, 1497.)
B. Millennium’s Coverage Claim
Millennium was in the business of processing titanium dioxide, a compound often used for its white pigmentation, at its processing facility in Western Australia. The energy source for Millennium’s titanium dioxide processing operation was natural gas received through the Dampier-to-Bunbury Natural Gas Pipeline (the “DB Pipeline”), Western Australia’s principal gas transmission pipeline. Millennium purchased the gas under a contract with Alin-ta Sales Pty Ltd (“Alinta”), a retail gas supplier. Alinta purchased the gas it offered for sale from a number of natural gas producers, one of which was Apache Corporation (“Apache”).
As a natural gas producer, Apache extracted and processed natural gas from wells on Varanus Island, an island located off the coast of Western Australia. Once Apache processed the natural gas, it would inject the gas into the DB Pipeline, at which point custody, title, and risk passed from Apache to Alinta. The natural gas received from Apache’s facility then comin-gled with that obtained from other producers, resulting in an amorphous mix of gas in a single pipeline.
Apache has no ownership interest in the DB Pipeline and does not own any downstream gas transmission or distribution facilities. Alinta retains sole ownership of the gas once it enters the DB Pipeline. Under Alinta’s end-user contract with Millennium, title to the gas passed to Millennium only at the time of delivery, i.e., when the gas left the DB Pipeline and was delivered to Millennium’s facility by way of a separate delivery line. Millennium’s contract for the purchase of natural gas was solely with Alinta. Millennium had no contract or business relationship with Apache, and the contract with Alinta made no reference to Apache. At the time period relevant to this appeal, Apache produced about 20% of the natural gas that Alinta sold.
On June 3, 2008, an explosion occurred at Apache’s Varanus Island facility, causing its natural gas production to cease. Apache notified Alinta that the explosion caused it to shut down its operations and that there would be no gas supply from Varanus Island until further notice. Alin-ta, in turn, sent a notice of force majeure to Millennium and other customers. The Australian government quickly intervened and imposed controls prioritizing delivery *283 of natural gas to domestic customers and essential services. As a result, Millennium’s gas supply was curtailed, and it was forced to shut down its titanium dioxide manufacturing operations for a number of months.
Two days after the explosion, on June 5, 2008, Millennium sent notice of claim letters to National Union and ACE, seeking CBI coverage for its losses incurred when the titanium dioxide facility closed. The Insurers investigated Millennium’s claim and provided a detailed report explaining the Australian gas distribution system and concluding that Apache was not a direct supplier to Millennium. As a consequence, the Insurers determined there was no coverage under the Policies for Millennium’s claim, but invited Millennium to provide evidence of a direct relationship between Millennium and Apache sufficient to establish policy coverage.
Millennium responded by asserting, inter alia, that Apache was a direct supplier to it because Alinta provided only a service, the delivery of natural gas, whereas Apache provided the actual material at issue. National Union reaffirmed its denial of Millennium’s claim, contending that Alinta, and not Apache, was the only direct supplier of natural gas to Millennium. There was no further communication between the parties.
C. Proceedings in the District Court
In July 2009, Millennium filed a complaint against the Insurers in the United States District Court for the District of Maryland, invoking the court’s diversity jurisdiction.[3] Millennium requested a declaratory judgment regarding the rights and liabilities of the parties with respect to the Policies. Further, Millennium asserted claims of breach of contract[4] and failure to act in good faith pursuant to section 3-1701 of the Maryland Courts and Judicial Proceedings Code.
After the close of discovery, Millennium moved for partial summary judgment on its declaratory judgment claim, arguing that the Policies unambiguously covered Millennium’s loss because the Endorsements did not limit coverage to direct suppliers. The Insurers filed a joint cross-motion for summary judgment on Millennium’s declaratory judgment and bad faith claims, contending that the Policies provided coverage only for direct suppliers and that Apache was not a direct supplier to Millennium. The Insurers also argued that Millennium failed to present any evidence in support of its bad faith claim.
The district court entered an order granting Millennium’s motion for partial summary judgment, denying the Insurers’ motion for summary judgment with respect to Millennium’s declaratory judgment claim, and granting the Insurers’ motion with respect to Millennium’s bad faith claim. In an accompanying opinion, the district court reviewed and interpreted the Policies,[5] concluding that coverage un *284 der the Policies extended only to “direct contributing properties.” In determining the meaning of the term “direct contributing property,” the district court reviewed existing caselaw on CBI coverage.
The district court concluded that “the physical relationship between the properties is as or more important than the legal relationship between the properties’ owners.” (J.A.1991.) The district court held that Millennium’s contract with Alinta had “no effect on the physical realities of natural gas supply between [Apache] and [Millennium]” because, although Alinta took title to the gas when it traveled through the DB Pipeline, Alinta “never [took] physical possession of the gas and [had] no ‘property’ with which to do so.” (J.A. 1991.)
The district court then observed that “the policies do not define the term ‘direct,’ ” and concluded that “the term ‘direct’ is ambiguous here, in the context of an entity that provides a direct physical supply of material to the insured, but has no direct contractual relationship with the insured.” (J.A.1993.) Although the parties presented extrinsic evidence to establish the meaning of “direct,” the district court concluded that none of that evidence “speaks to the specific meaning the parties intended by the use of the word ‘direct.’ ” (J.A.1994.) In order to resolve the ambiguity, the district court applied the doctrine of contra proferentem[6] in favor of Millennium. Accordingly, the district court held that Apache qualified as a “direct” supplier to Millennium and that Apache’s natural gas production facility was a “direct contributing property” within the meaning of the Policies “because Apache’s facility physically provided a direct supply of natural gas to Millennium’s premises, despite the fact that Apache and Millennium had no direct contractual relationship.” (J.A.1995.)
As an alternative holding, the district court opined that the Endorsements also provided coverage for damage to contributing properties “ ‘which wholly or partially prevents the delivery of materials to [Millennium] or to others for the account of [Millennium].’ ” (J.A.1995.) The district court then concluded that this provision was also ambiguous because it did not explain “who must hold the ‘account of the Insured’ — the one who delivers, or the ‘others’ to whom delivery is made.” (J.A. 1998.) Based upon this ambiguity, the district court again applied the doctrine of contra proferentem, construing “the phrase [‘for the account of] in favor of coverage for the insured,” Millennium. (J.A.1998.)
After the district court granted Millennium’s motion for partial summary judgment, the parties stipulated and agreed to *285 the entry of judgment in favor of Millennium in the amount of $10,850,000, inclusive of pre-judgment interest, with the Insurers expressly preserving their right to appeal the judgment. The district court then entered final judgment against the Insurers in the stipulated amount, and the Insurers timely appealed. We have jurisdiction under 28 U.S.C. § 1291.
II
We review a district court’s grant of a motion for summary judgment de novo, construing all facts and reasonable inferences in favor of the non-moving party. Crockett v. Mission Hosp., Inc., 717 F.3d 348, 350 n. 1, 354 (4th Cir.2013).
III
When interpreting insurance contracts, courts first look to the plain language of the provision at issue. See Fed. Ins. Co. v. Int’l Bus. Machs. Corp., 18 N.Y.3d 642, 942 N.Y.S.2d 432, 965 N.E.2d 934, 935 (2012); Chubb Custom Ins. Co. v. The Prudential Ins. Co. of Am., 195 N.J. 231, 948 A.2d 1285, 1289 (2008). If the plain language of the provision is clear, “that is the end of the inquiry.” Chubb Custom, 948 A.2d at 1289.
Beginning with the plain language of the Policies, as the district court found and Millennium concedes, the Endorsements provided coverage only with respect to “direct contributing properties.” Millennium argues that the term “direct” is ambiguous because it could refer either to the legal relationship between the contributing property and the insured or the physical relationship between those parties. We find the term “direct” to be clear as used in the Policies and without ambiguity.
The term “direct” is defined as “proceeding from one point to another in time or space without deviation or interruption,” “transmitted back and forth without an intermediary,” or “operating or guided without digression or obstruction.” Webster’s Third New International Dictionary 610. Thus, for Apache to be considered a direct contributing property to Millennium, it must have supplied Millennium with materials necessary to the operation of its business “without deviation or interruption” from “an intermediary.”[7] Id.
On the undisputed facts of this case, neither Apache nor Apache’s facilities on Varanus Island can be considered a “direct contributing property” of Millennium. Millennium does not dispute that it received its gas from Alinta, and that Alin-ta — and not Apache — had the sole ability to control the amount of gas directed to Millennium, to determine the rate at which Millennium would be charged for that gas, and even to shut the gas off completely. Indeed, Millennium concedes that it has no *286 legal relationship, direct or otherwise, with Apache.
Millennium also does not dispute that it received its gas by way of the DB Pipeline, and that the DB Pipeline is neither owned nor operated by Apache. Nor does Millennium dispute that Apache relinquished both legal title and physical control over the gas once it entered the DB Pipeline. In fact, Millennium concedes that Apache had no control over whether Millennium received its gas and that, due to commingling, Millennium could not demonstrate how much, if any, of the gas it received originated with Apache. Thus, neither Apache nor Apache’s facilities had a direct physical relationship with Millennium.
Whatever the relationship between Apache and Millennium, it was clearly interrupted by “an intermediary,” Alinta, who took full physical control of Apache’s gas before delivering indistinguishable commingled gas to Millennium. That relationship was also interrupted by an intervening step, the physical insertion of the gas into the DB Pipeline, at which point Apache relinquished all physical control over that gas. Under any view of the relevant facts, Apache can therefore be only an indirect contributing property to Millennium, coverage of which is not included in the terms of the Policies.[8]
Having concluded that, on the plain language of the Policies, Apache cannot be considered a direct contributing property to Millennium, we consider Millennium’s alternative argument that it could also receive coverage under the “for the account of’ clause of the Endorsements. Millennium’s alternative contention fails for the same reason as its primary argument. Under the plain language of the Policies, coverage is triggered only by damage to or destruction of direct contributing properties. Because Apache is at most an indirect supplier to Millennium, there can be no coverage under any reading of the “for the account of’ clause. Therefore, Millennium presents no plausible reading of the Policies under which it could receive coverage for its CBI losses.[9]
IV
For the foregoing reasons, the judgment of the district court is reversed, and we remand the case to the district court for entry of summary judgment in favor of the Insurers.

REVERSED AND REMANDED.

. Generically, business interruption insurance coverage protects the insured party against losses stemming from unexpected interruptions of normal business operations resulting from damage to property caused by a covered hazard. 11 Steven Plitt et al., Couch on Insurance 3d § 167:9 (2013). A subset of business interruption coverage, termed CBI coverage, protects against business losses caused by damage to property not owned by the insured party. Id. § 167:14. The only provision of the policies at issue in this case concerns the CBI coverage.

. The term "contributing properties” means "the insured’s prime suppliers of materials, parts and services. If the insured depends upon one or, at most, a few manufacturers or suppliers for the bulk of materials and supplies necessary to conduct its business operations, then these suppliers are said to be contributing properties.” Insuring Real Property § 3.03[2] (Stephen A. Cozen ed.2013); (see J.A. 1707). Consistent with this industry definition, the Endorsements define "contributing property” by reference to the policy schedules, which state that covered locations "must be direct suppliers of materials to [Millennium’s] locations.” (J.A. 1392, 1496.) The parties in this case use the term "contributing property” interchangeably with the term "supplier.” (See, e.g., Response Br. 27 n. 12.)

. Millennium also asserted several claims against Marsh, but voluntarily dismissed those claims pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure. Millennium’s claims against Marsh are not at issue on appeal.

. Millennium's breach of contract claim was based upon the Insurers' refusal to cover Millennium's CBI losses arising out of the Vara-nus Island explosion, and Millennium asserts coverage only under the Endorsements. Thus, Millennium’s breach of contract claim must rise or fall with its coverage claim.

.Finding that the Policies lacked choice of law provisions, the district court applied a Maryland choice of law analysis to determine which state’s law applied to the construction of the Policies. See CACI Int’l, Inc. v. St. Paul Fire & Marine Ins. Co., 566 F.3d 150, 154 (4th Cir.2009) (holding that federal courts exercising diversity jurisdiction "apply the choice of law rules of the forum state”). Millennium *284 argued. in favor of New Jersey law and the Insurers argued in favor of New York law. The district court concluded that, under a lex loci analysis, New York law would apply, but ultimately declined to reach a decision, reasoning that there was no meaningful difference in the common law regarding interpretation of insurance policies of either state. We need not perform a choice of law analysis on appeal because the parties now agree that there is no substantive difference between the applicable laws of New York and New Jersey with respect to the issues in this case, and each party cites to both New York and New Jersey caselaw. We therefore cite to the laws of both jurisdictions.

. When a court determines that a provision in an insurance contract is ambiguous and "extrinsic evidence does not yield a conclusive answer as to the parties’ intent,” the rule of contra proferentem provides that "where an insurer drafts a policy, 'any ambiguity in [the] ... policy should be resolved in favor of the insured.’ " Morgan Stanley Group Inc. v. New England Ins. Co., 225 F.3d 270, 276 (2d Cir.2000) (quoting McCostis v. Home Ins. Co., 31 F.3d 110, 113 (2d Cir.1994)).

. Our colleague in dissent argues that the term "direct” is ambiguous as used in the Policies because the dictionary contains another definition for the term, "from the source or the original without interruption or diversion.” See Webster’s Third New International Dictionary 640. However, the definition cited to in the dissent is the adverbial definition of the term “direct,” even though the term is clearly used as an adjective in the operative policy phrase, "direct contributing properties.” Regardless, the phrase "without interruption or diversion” as used in the adverbial definition of the term "direct” has the same meaning as the phrase "without digression or obstruction” as used in the adjectival definition, demonstrating that the term “direct” has a single clear, unambiguous meaning. Even using the phrase selected by the dissent, it is unambiguous that there is no "direct” transfer of gas from Apache to Millennium because of the unescapable fact of the “interruption or diversion” by the presence of Alinta and the DB Pipeline as interrupting intermediaries.

. The Insurers failed to argue in their briefing that the Binders, which stated directly that "THERE SHALL BE NO COVERAGE FOR INDIRECT SUPPLIERS/RECIPIENTS,” J.A. 1289, were the operative documents at the time of the explosion on Varanus Island. Had the Insurers properly made that argument before this Court, that language would also demonstrate that Millennium had no coverage on the facts of this case.

. As we find no basis for coverage of Millennium’s CBI losses under the Endorsements, Millennium’s breach of contract claim, as pleaded, also must fail.