**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 22-1621**

───────────

JEREMY W. SCHULMAN,

       Plaintiff - Appellant,

v.

AXIS SURPLUS INSURANCE COMPANY; ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY; PROSIGHT SYNDICATE 1110 AT LLOYD'S,

       Defendants - Appellees.

───────────

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Lydia Kay Griggsby, District Judge. (8:21−cv−01252−LKG)

───────────

Argued:  October 26, 2023                     Decided:  January 4, 2024

───────────

Before WYNN, HARRIS, and BENJAMIN, Circuit Judges.

───────────

Affirmed by published opinion. Judge Wynn wrote the opinion, in which Judge Harris and Judge Benjamin joined.

───────────

**ARGUED:** Jillian M. Raines, COHEN ZIFFER FRENCHMAN & MCKENNA LLP, New York, New York, for Appellant.  Charles Collins Lemley, WILEY REIN, LLP, Washington, D.C.; Marc Rechnic Kamin, STEWART SMITH, West Conshohocken, Pennsylvania, for Appellees. **ON BRIEF:** Jeffrey M. Schwaber, Deanna L. Peters, STEIN SPERLING BENNETT DE JONG DRISCOLL PC, Rockville, Maryland; Robin L. Cohen, COHEN ZIFFER FRENCHMAN & MCKENNA LLP, New York, New York, for Appellant.  John J. Murphy, WALKER, MURPHY & NELSON, LLP, Rockville, Maryland, for Appellee ProSight Syndicate 1110 at Lloyd's.  Gary P. Seligman, WILEY

REIN LLP, Washington, D.C., for Appellees AXIS Surplus Insurance Company and Endurance American Specialty Insurance Company.

WYNN, Circuit Judge:

Plaintiff Jeremy Schulman appeals from the district court's decision granting summary judgment to Defendants AXIS Surplus Insurance Company ("AXIS"), Endurance American Specialty Insurance Company ("Endurance"), and Prosight Syndicate 1110 at Lloyd's ("Prosight") (collectively, "the Carriers"). Schulman sued the Carriers for breach of contract, detrimental reliance, and lack of good faith, claiming that they wrongfully denied his claim for coverage under his law firm's professional liability insurance policy.

Because we hold that Schulman is not entitled to coverage under his professional liability insurance policy, that the insurers never made a clear and definite promise to cover the expenses over which Schulman has sued, and that his lack-of-good-faith claim at a minimum requires him to show that he was entitled to coverage, we affirm the district court's grant of summary judgment on all claims.

I.

A.

Until 2017, Schulman was an equity shareholder at the Maryland law firm Shulman, Rogers, Gandal, Pordy & Ecker ("the Law Firm"). During Schulman's tenure at the Law Firm, the Law Firm purchased a $20,000,000 professional liability insurance policy from the Carriers that covered the policy period spanning from August 22, 2016, to August 22, 2017.[1] AXIS and Endurance ("the Primary Carriers") each insured fifty percent of the first

---

[1] Schulman does not dispute that this is the relevant policy.

3

$10,000,000 of liability per claim and in the aggregate. And Prosight provided $10,000,000 in excess limits of liability per claim and in the aggregate. The AXIS, Endurance, and Prosight Policies (collectively, "the Policy") contain identical terms.

The Policy provides that the Carriers will "pay on behalf of the Insureds all Loss . . . resulting from Claims for Wrongful Acts committed before the expiration of the Policy Period that are first made against any Insured during the Policy Period." J.A. 212.[2] The parties do not dispute that Schulman is an Insured within the meaning of the Policy.

The Policy defines a Claim as:

1. any of the following:
   a. a written demand against any Insured for monetary or non-monetary relief;
   b. a civil proceeding against any Insured commenced by the service of a complaint or similar pleading;
   c. a written demand for arbitration or mediation;
   d. a formal civil administrative or civil regulatory proceeding against any Insured, including, but not limited to, a Disciplinary Proceeding, commenced by the filing of a notice or charges or similar document or by the entry of a formal order of investigation or similar document;
2. a written request received by an Insured to toll or waive a statute of limitations relating to a matter described in subparagraph 1. above.

J.A. 213.

B.

On January 27, 2017, the U.S. Department of Justice served the Law Firm with a grand jury subpoena in connection with an ongoing criminal investigation. The subpoena

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

4

sought production of documents relating to the Law Firm's representation of various entities and individuals, including the Federal Government of Somalia, the Transitional Federal Government of Somalia, the Central Bank of Somalia, and the Somali Ministry of Finance.

On January 31, 2017, the Law Firm notified the Carriers of the subpoena as a potentially covered Claim. Three days later, the Carriers informed the Law Firm that the Department of Justice subpoena did not constitute a Claim and therefore did not trigger the Policy's coverage.

After further communication, the Carriers sent the Law Firm a letter on April 5, 2017. The letter stated that the Carriers understood that Schulman had retained Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") "*to assist in responding to the subpoena.*" J.A. 385 (emphasis added). While the Carriers noted that they continued to "dispute that there is a duty to indemnify [the Law Firm] for defense costs incurred with respect to the [Department of Justice]'s subpoena," they stated that they were "willing to resolve" the coverage dispute by paying "70% of defense fees incurred with respect to" Akin Gump. J.A. 386.

On May 20, 2017, Schulman emailed the Primary Carriers and explained that the Law Firm had advised him that the Carriers had "agreed to reimburse [him] for '70% of defense fees incurred with respect to Akin Gump,' which is the law firm [he] engaged to represent [him] in connection with the investigation and any related proceedings." J.A. 297. Schulman further noted that he had not been provided with any written documentation regarding the Carriers' agreement to reimburse defense fees and asked the Primary Carriers

to "treat this email as [his] effort to establish . . . confirmation of the payment agreement referenced above." J.A. 297–98.

On June 22, 2017, the Primary Carriers replied to Schulman's email with a letter ("the June 22 letter"). They reiterated their original position that "no Claim for a Wrongful Act had been made within the meaning of the policy," then stated that "[a] compromise was reached with the insured [Law F]irm on these issues, whereby [the Carriers] have agreed to cover 70% of defense fees and 100% of costs incurred with respect to this matter under a reservation of rights." J.A. 300. While the Primary Carriers did not define "this matter," they did begin their letter by stating that they were responding to Schulman's email "regarding the captioned matter involving a subpoena from the U.S. Department of Justice." *Id.*

Beginning in May 2017, Akin Gump submitted invoices to the Primary Carriers and eventually received more than $700,000 in payment on those invoices.

On December 2, 2020, a grand jury in the District of Maryland returned an indictment charging Schulman with mail fraud, wire fraud, bank fraud, money laundering, conspiracy to commit mail, wire, and bank fraud, and conspiracy to commit money laundering ("the Indictment"). In short, the Indictment alleged that Schulman had conspired with various Somali entities and individuals to recover millions of dollars in frozen Somali assets. Schulman allegedly executed the fraud by representing to financial institutions, through various forged documents, that he was authorized to take control of the Somali assets on behalf of the Law Firm's clients. The Indictment further alleged that Schulman and the Law Firm retained a portion of the fraudulently obtained assets. The

6

Indictment warned that the government would "seek forfeiture as part of any sentence . . . in the event of [Schulman's] conviction of any of the offenses" contained in the Indictment (the "forfeiture allegation"). J.A. 293.

Later that month, the Primary Carriers stopped paying the invoices from Akin Gump. Three months later, on March 12, 2021, the Primary Carriers sent letters to Akin Gump denying coverage for expenses related to the Indictment and stating that the Indictment does not constitute a "Claim as defined by the Policy, which is limited in pertinent part to civil rather than criminal proceedings." J.A. 314.

C.

On April 6, 2021, Schulman filed suit against the Carriers in Maryland state court. The Carriers subsequently removed the suit to federal district court based on diversity jurisdiction. Schulman's complaint asserted claims for breach of contract against the Primary Carriers based on the Policy's language (Count I); breach of contract against the Primary Carriers based on the language of the June 22 letter (Count II); anticipatory breach of contract against all Carriers based on the Policy's language (Count III); declaratory relief against all Carriers based on the Policy's language (Count IV); detrimental reliance against the Primary Carriers based on the June 22 letter (Count V); and lack of good faith against the Primary Carriers based on Maryland "statutory, regulatory and common law" (Count VI). J.A. 33.

The parties filed cross-motions for summary judgment. The district court denied Schulman's motion for partial summary judgment, granted the Carriers' motion for summary judgment, and dismissed the action.

7

In so doing, the district court granted summary judgment to the Carriers on 1) Counts I, III, and IV because it found that the Indictment did not constitute a Claim under the language of the Policy; 2) Count II because it found that, even if the June 22 letter constituted a contract, it did not obligate the Primary Carriers to pay defense fees associated with the Indictment; 3) Count V because it found that the June 22 letter did not create a promise from the Primary Carriers to Schulman that they would pay his defense fees associated with the Indictment and that, even if they had made such a promise, Schulman could not prove he relied on the promise; and 4) Count VI because it found that Maryland state law does not recognize the tort of lack of good faith with regard to an insurance carrier's decision to deny coverage.

Schulman timely appealed, challenging the district court's decision as to each of his claims.[3]

## II.

We review a district court's grant of summary judgment de novo, construing all facts and reasonable inferences in favor of the nonmoving party. *Millennium Inorganic Chems. Ltd. v. Nat'l Union Fire Ins. Co.*, 744 F.3d 279, 285 (4th Cir. 2014).

## A.

We first address Schulman's argument that the Indictment qualifies as a Claim under the Policy. "Because this case is in federal court based on diversity jurisdiction, we follow state law in interpreting the insurance contract at issue." *Brown Goldstein Levy LLP*

---

[3] We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

*v. Fed. Ins. Co.*, 68 F.4th 169, 174 (4th Cir. 2023). And because the parties do not dispute that Maryland law governs, we look to how Maryland courts would interpret the Policy. *See Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assur. Co.*, 913 F.3d 409, 415 n.4 (4th Cir. 2019) (noting that where the parties agree that a certain State's law applies, "we need not inquire further into the choice-of-law question[]").

In Maryland, an insurance policy is construed "according to contract principles." *Md. Cas. Co. v. Blackstone Int'l Ltd.*, 114 A.3d 676, 681 (Md. 2015). "When the clear language of a contract is unambiguous, the court will give effect to its plain, ordinary, and usual meaning, taking into account the context in which it is used." *Id.* (quoting *Sy-Lene of Wash., Inc. v. Starwood Urb. Retail II, LLC*, 829 A.2d 540, 546 (Md. 2003)). If a policy is ambiguous, we will construe the ambiguity against the drafter (here, the Carriers). *See Megonnell v. United Servs. Auto. Ass'n*, 796 A.2d 758, 772 (Md. 2002).

As stated earlier, the Indictment indicated that the government would "seek forfeiture as part of any sentence . . . ." J.A. 293. The parties dispute whether that forfeiture allegation qualifies as a "written *demand* against any Insured for monetary or non-monetary relief" under the Policy's definition of a Claim, such that the Policy covers Schulman's legal fees related to the forfeiture allegation. *See* J.A. 213 (emphasis added).

Because no Maryland case law provides a definitive definition of a "demand," we look to the dictionary definition of the term. *See Credible Behav. Health, Inc. v. Johnson*, 220 A.3d 303, 311 (Md. 2019) ("Traditionally, to supply contractual language with its ordinary and accepted meanings, this Court consults the dictionary definition of such terms." (cleaned up) (quoting *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 488 A.2d 486,

9

489 (Md. 1985))). The dictionary Schulman cites in his brief defines a "demand" as "something claimed as due or owed." *Demand*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/demand [https://perma.cc/M89C-UC4A]. Similarly, Black's Law Dictionary defines the noun "demand" as "[t]he assertion of a legal or procedural right," and defines the verb as "[t]o claim as one's due; to require; to seek relief." *Demand*, Black's Law Dictionary (11th ed. 2019). Applying those definitions, we conclude that the Indictment is not a demand.

The forfeiture allegation in the Indictment states that "notice is hereby given to the defendant that the United States *will seek* forfeiture as part of any sentence . . . *in the event of the defendant's conviction of any of the offenses*." J.A. 293 (emphasis added). The forfeiture allegation did not require Schulman to turn over any money or property to the government. It merely informed him that, *if he was convicted* in the future, the government would seek forfeiture of various money and property. At most, therefore, the forfeiture allegation is a notice that there will be a demand in the future. The ordinary meaning of "demand" does not encompass a notice that, on the condition a triggering event occurs, something will be demanded in the future.

In support of his view to the contrary, Schulman cites various cases—none from Maryland—concluding that a *subpoena* sent in connection with a criminal proceeding constitutes a demand for relief. Opening Br. at 26–27 (collecting cases); *see, e.g.*, *Syracuse Univ. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 975 N.Y.S.2d 370, at *2 (N.Y. Sup. Ct. Mar. 7, 2013) (unpublished table decision) ("[G]overnment issued subpoenas and other document requests are demands for non-monetary relief under the plain policy language.").

10

He argues that if courts consider a subpoena connected to a criminal proceeding as a demand for relief, then an indictment must be a demand for relief as well.

To be sure, in evaluating the Policy, a Maryland court might look to how courts in other jurisdictions have interpreted similar contracts. *E.g.*, *Jocelyn P. v. Joshua P.*, 302 A.3d 1111, 1138 (Md. App. Ct. 2023) (finding an Illinois court's contractual interpretation "helpful"). But even assuming Maryland courts would treat *subpoenas* as "demands" when interpreting contract language like the Policy's, compliance with a subpoena requires some present action by the recipient. In contrast, there was no action Schulman needed to take to comply with the forfeiture allegation—he was merely informed of an action that he *might* need to take in the future. *Cf. Brown Goldstein Levy*, 68 F.4th at 176 (holding that a search warrant is not a demand because "the target of a warrant is 'not asked to say or to do anything' in response to the warrant" (quoting *Andresen v. Maryland*, 427 U.S. 463, 473 (1976))). Therefore, even if a subpoena would qualify as a "demand" under the Policy, it does not follow that an indictment also qualifies.

Schulman also argues that the Indictment is a demand because it serves the same notice-providing function as a demand. Citing the Second Circuit's decision in *Gil Enterprises, Inc. v. Delvy*, 79 F.3d 241, 246 (2d Cir. 1996)—which interpreted New York law—he argues that the Indictment qualifies as a demand because it provides notice of the charges against him and that the Government plans to seek forfeiture if he is convicted. *Gil Enterprises* concluded that a *civil* demand informing the recipient of their "rights and obligations" and placing them "on notice that those legal obligations have been triggered" constituted a demand within the meaning of the contract at issue in that case. *Id.* In so

11

holding, the Second Circuit noted that such notice is important because "[w]ithout notice, [a] demand would serve no purpose because it would fail to provide [the recipient] with the *opportunity to cure* any" alleged disputes. *Id.* (emphasis added).

But the notice-providing function of a classic demand, such as a civil demand letter, reinforces that the Indictment does not qualify as a demand. The recipient of a civil demand can avoid litigation by satisfying the demand. *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 94–95 (2013) (defendant mooted case by providing all relief sought and guaranteeing that "the challenged conduct cannot reasonably be expected to recur"); 13B Charles A. Wright & Arthur Miller, Fed. Prac. & Proc. Juris. § 3533.2 (3d ed. 2008 & Supp. 2023) ("Action by the defendant that simply accords all the relief demanded by the plaintiff may have the same effect as settlement or an offer of settlement. So long as nothing further would be ordered by the court, there is no point in proceeding to decide the merits."). In contrast, a criminal defendant has no right to terminate a prosecution solely by returning the proceeds of their alleged crimes.

Furthermore, while the Federal Rules of Criminal Procedure prohibit a court from entering a judgment of forfeiture unless the indictment or bill of information contained a notice of forfeiture like the one in the Indictment here, "[t]he indictment . . . need not identify the property subject to forfeiture or specify the amount of any forfeiture money judgment that the government seeks." Fed. R. Crim. P. 32.2(a). In cases in which forfeiture is contested, the court must conduct a hearing—and the government must specify the property sought to be forfeited and prove its connection to the crimes of which a defendant was convicted—only after the verdict or finding of guilt. Fed. R. Crim. P. 32.2(b). So,

while a forfeiture allegation in an indictment is a prerequisite to an order of forfeiture, it does not necessarily provide notice of the property to be forfeited and therefore does not serve the specific notice-providing function of a demand.

Because the Indictment is not a "written demand . . . for monetary or non-monetary relief," J.A. 213, and because it does not even arguably fall under one of the other enumerated subparts of the Policy's definition of a Claim, we affirm the district court's grant of summary judgment on Counts I, III, and V.[4]

B.

Schulman next argues that, even if the Policy did not obligate the Primary Carriers to pay defense fees associated with the Indictment, the June 22 letter did. In his view, the June 22 letter—which he refers to as the "Advancement Agreement"—was a binding contract that obligated the Primary Carriers to pay 70% of attorney's fees and 100% of costs related to the Indictment.[5] Opening Br. at 44. We once again disagree.

As with the Policy, we interpret the June 22 letter based on its plain language in accordance with Maryland law. *See Md. Cas. Co.*, 114 A.3d at 681. Assuming, without

---

[4] Since we conclude that an Indictment is not a demand, we need not reach the parties' arguments about whether the Policy's definition of a Claim could ever encompass criminal proceedings.

[5] Because of the compromise between the Carriers and the Law Firm, the parties do not dispute coverage for expenses related to the subpoena. Schulman's complaint alleges that the Primary Carriers ceased reimbursing his attorneys "with payment on prior months' invoices outstanding." J.A. 21. We recognize that it is at least debatable whether fees incurred prior to the Indictment are incurred defending against the Indictment or the subpoena. But, on appeal, Schulman only advances arguments that he is entitled to coverage of all fees and expenses relating to the Indictment. "A party waives an argument

13

deciding, that the June 22 letter formed a binding contract between the Primary Carriers and Schulman, the plain language of the letter limits coverage to the subpoena. The first sentence of the June 22 letter specifies that it is a response "regarding the captioned *matter involving a subpoena* from the U.S. Department of Justice." J.A. 300 (emphasis added). That language makes clear that any promises contained in the letter are limited to matters relating to the subpoena.

To be sure, Schulman's email, which prompted the June 22 letter, reflected *his* understanding that the Primary Carriers had agreed to pay 70% of Akin Gump's fees and noted that he retained Akin Gump to "represent [him] in connection with the investigation *and any related proceedings*." J.A. 297 (emphasis added). But his email sought clarification of a preexisting agreement. The June 22 letter supplied that clarification, stating that a "compromise was reached" to "cover 70% of defense fees and 100% of costs incurred with respect to *this matter*." J.A. 300 (emphasis added). Since "this matter" refers to the language limiting the subject of the letter to the "matter involving a subpoena," we cannot reasonably give it the broad reading that Schulman seeks. Accordingly, the July 22 letter does not provide coverage for fees and expenses incurred defending the Indictment, and we therefore affirm the district court's grant of summary judgment on Count II.

---

by failing to present it in its opening brief or by failing to develop its argument—even if its brief takes a passing shot at the issue." *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (cleaned up). Accordingly, Schulman has waived any claim in the alternative that the district court erred in granting summary judgment because he is entitled to coverage for fees incurred solely relating to the subpoena even if he is not entitled to coverage for fees incurred defending against the Indictment.

14

C.

Relatedly, Schulman argues that the June 22 letter created a promise to cover fees and costs related to the Indictment and that he reasonably relied on that promise to his detriment.

Maryland requires a plaintiff to prove four elements to establish a detrimental-reliance claim: "1. a clear and definite promise; 2. where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee; 3. which does induce actual and reasonable action or forbearance by the promisee; and 4. causes a detriment which can only be avoided by the enforcement of the promise." *Pavel Enters., Inc. v. A.S. Johnson Co., Inc.*, 674 A.2d 521, 532 (Md. 1996).

In determining whether a party has provided a clear and definite promise, courts must make a "fact-specific judgment" about the contents of the alleged promise. *Id.* at 533. Since Schulman's claim that the Primary Carriers made him a clear and definite promise rests on the contents of the June 22 letter, our determination again turns on the plain language of that letter. And because the plain language of the June 22 letter does not promise to cover anything besides fees and expenses related to the subpoena, Schulman's detrimental-reliance claim fails without inquiry into the other elements. We therefore affirm the district court's grant of summary judgment on Count V.

D.

We last address Schulman's lack-of-good-faith claim, which he brought in relevant part under Maryland "statutory . . . and common law." J.A. 33. On appeal, Schulman argues that the district court erred by 1) failing to analyze his statutory claim, and 2) finding that

15

no claim existed under Maryland common law. Neither source supports a cause of action in this case.

First, Maryland statutory law provides a cause of action against insurance carriers for lack of good faith in denying coverage.[6] *See* Md. Code, Cts. & Jud. Proc. § 3-1701. But "a plaintiff may only prevail on such a claim where the plaintiff proves that [he] was entitled to coverage under the policy." *Dominant Invs. 113, LLC v. U.S. Liab. Ins. Co.*, 247 F. Supp. 3d 696, 704 (D. Md. 2017), *aff'd*, 707 F. App'x 155 (4th Cir. 2017) (per curiam); *see also St. Paul Mercury Ins. Co. v. Am. Bank Holdings, Inc.*, 819 F.3d 728, 739 (4th Cir. 2016) ("Section 3-1701(d)(1)(i) provides that the statutory claim for failure to act in good faith applies to civil actions in which the insured seeks a determination of whether coverage actually exists under an insurance policy, and § 3-1701(e) requires a finding 'in favor of the insured' on that coverage question." (emphasis omitted) (citing Md. Code, Cts. & Jud. Proc. §§ 3-1701(d), 3-1701(e))). Because, as discussed above, Schulman was not entitled to coverage under the Policy, his statutory claim fails.

Second, as to the common law, Maryland's highest court has held that, "[s]ince the source of the duties to defend and to indemnify are entirely contractual, a liability insurer

---

[6] The statute "applies only to first-party claims under property and casualty insurance policies or individual disability insurance policies." Md. Code, Cts. & Jud. Proc. § 3-1701(b). But it incorporates a definition of casualty insurance that includes "insurance against any other kind of loss, damage, or liability that is properly a subject of insurance and not within any other kind of insurance described in this subsection." Md. Code, Ins. § 1-101(i)(1)(iii). Professional liability insurance does not fall under any of the categories of insurance described in § 1-101, so it qualifies as a type of casualty insurance under Maryland law. Accordingly, § 3-1701 provides a cause of action against insurance carriers for lack of good faith in denying coverage on a professional liability insurance policy.

breaches no tort duty when, upon learning of a claim, it erroneously denies coverage and refuses to undertake any defense against the claim." *Mesmer v. Md. Auto Ins. Fund*, 725 A.2d 1053, 1061 (Md. 1999). Because this dispute revolves around the Carriers' denial of coverage, Maryland common law does not support Schulman's lack-of-good-faith claim.[7]

Accordingly, we affirm the district court's grant of summary judgment on Count VI because Schulman's claim fails under both statutory and common law.

## III.

For the reasons detailed above, we affirm the district court's decision granting summary judgment to the Carriers on each of Schulman's claims.

*AFFIRMED*

---

[7] While Schulman points out that *Mesmer* was decided eight years prior to the enactment of § 3-1701, he provides no argument that § 3-1701 changed the common law rule rather than adding an alternative statutory cause of action. "A party waives an argument by failing to present it in its opening brief or by failing to develop its argument— even if its brief takes a passing shot at the issue." *Grayson O*, 856 F.3d at 316 (cleaned up). To the extent Schulman was attempting to argue that the enactment of § 3-1701 modified the common law rule stated in *Mesmer*, we therefore consider that argument waived.